**SHERMAN INDUSTRIES, INC.**

v.

**Joel S. GOLDHAMMER and Seidel, Gonda & Goldhammer, P.C.**

Civ. A. No. 86–1441.

United States District Court, E.D. Pennsylvania.

April 1, 1988.

Benjamin E. Zuckerman, Norristown, Pa., for plaintiff.

Joel S. Goldhammer, Seidel, Gonda & Goldhammer, P.C. by James A. Drobile, David Smith, Schnader, Harrison & Segal, Philadelphia, Pa., for defendants.

## MEMORANDUM

LOUIS H. POLLAK, District Judge.

This is a legal malpractice case arising out of unsuccessful patent litigation which exposed plaintiff to liability in excess of one million dollars. Plaintiff, Sherman Industries, Inc. ("Sherman"), a manufacturer of carwash equipment, is suing its former lawyer, Joel S. Goldhammer, Esq., and the law firm Seidel, Gonda & Goldhammer, P.C. (jointly referred to herein as "Goldhammer"). The essence of plaintiff's case is that defendants undertook to investigate a potential patent infringement and to ad-

vise plaintiff how to minimize the risks involved in developing its product, but that defendants gave inappropriate and inadequate advice and thereby caused plaintiff to incur substantial losses that should have been avoided. The case is now before me on defendants' motion for summary judgment.[1] Defendants contend that the claims asserted by plaintiff in its amended complaint are barred by the statute of limitations. For the reasons that follow, the claims are time-barred and the complaint is accordingly dismissed.

### I.

The circumstances of defendants' representation of plaintiff, viewed in the light most favorable to plaintiff, are as follows: In 1980 Sherman retained Goldhammer to advise it on patent validity and infringement.[2] In particular, Goldhammer did a validity study of an existing patent on a piece of carwash equipment, a bag blower called "The Stripper," which was manufactured by a Sherman competitor, Proto–Vest, Inc., for use in drying cars after they have gone through a carwash. Goldhammer assured Sherman that Proto–Vest's patent was invalid. Goldhammer accordingly advised Sherman that it need not modify the design of its own bag blower, the Model 1885. Sherman proceeded to manufacture and sell its Model 1885. Goldhammer meanwhile represented Sherman in a declaratory judgment action against Proto–Vest claiming patent invalidity and non-infringement. Proto–Vest met Sherman's declaratory judgment action with a counterclaim against Sherman for patent infringement.

On June 1983, after a trial on liability issues only, the district court found Sherman liable for patent infringement, and enjoined it from manufacturing and selling its bag blower. Notwithstanding the defeat at trial, Goldhammer continued to advise Sherman that Proto–Vest's patent was invalid, and assured Sherman that the decision of the district court would be overturned on appeal. In reliance on Goldhammer's advice, Sherman appealed from the district court decision, and obtained a stay of the injunction so that it could continue to manufacture its bag blower pending disposition of the appeal.

In advising Sherman, Goldhammer repeatedly insisted that Sherman would win the lawsuit against Proto–Vest. The record shows that Goldhammer did explain after the loss at trial that if Proto–Vest ultimately prevailed, Sherman would have to pay royalties and lost profits.[3] Sherman's officers paid more attention to Goldhammer's assurances of victory, however, than to minimizing the risks of loss. Sherman's officers did not ask Goldhammer to explain alternatives to suit, nor did they urge him to discuss further the downside risks of taking Proto–Vest to court.

On February 29, 1984, the Federal Circuit upheld the decision of the district court, and thereafter denied Sherman's petition for rehearing. Sherman nonetheless continued to retain Goldhammer, who began to prepare for the damages portion of the bifurcated trial.

Sherman began in the summer of 1984 to manufacture and sell a new version of its bag blower, the Model 1886. Sherman con-

---

1. Both plaintiff and defendants in captions describe the current motion as a motion to dismiss, but both request that it be treated as a motion for summary judgment because they rely on affidavits, deposition testimony, and other documents.

2. Since 1970 Sherman had relied almost exclusively on Goldhammer for advice on patent matters. *See* Transcript of deposition testimony of John H. Thacher, President of Sherman Industries [hereinafter Thacher N.T.] at 8–11, 72.

3. *See* Thacher N.T., at 159; letter dated March 2, 1984 from Joel Goldhammer to John Thacher,

Amended Complaint, Exhibit E. Mr. Thacher testified at his deposition as follows:

Q: When did you first ask [Mr. Goldhammer] to quantify what might happen if you lost?
A: I believe the first time we really tried to quantify it was just after we lost the first go around.
Q: So that would be June of '83?
A: June of '83.

And in the March 2, 1984 letter, Mr. Goldhammer wrote: "The damages we are discussing here are Proto–Vest's damages. That means Proto–Vest lost profits if it can prove it would have made the sale but for the fact that Sherman made the sale."

tends that the new model was similar to the predecessor model in all respects, except that it did not have the rectangular cross-section that the district court had found infringed Proto–Vest's patent. Amended Complaint ¶ 25.

Because Goldhammer himself apparently had been unaware of the appropriate measure of Proto–Vest's damages, it was not until some months after the appeal was lost that Goldhammer informed Sherman of the magnitude of the damages it might have to pay, and of the extent to which its decision to continue to manufacture the Model 1885 pending appeal might have further increased those damages. Goldhammer had not researched and investigated the damages question prior to the summer of 1984. *See* Amended Complaint, Exhibit E (letter from Goldhammer to Thacher, dated March 2, 1984, stating that Goldhammer had not conducted legal research into the applicable measure of damages). In his initial advice to Sherman that it might have to pay Proto–Vest for lost profits, Goldhammer had not offered any definition of lost profits. Thacher N.T. at 143. Interrogatories to Proto–Vest drafted by Goldhammer and served in July of 1984 sought information about Proto–Vest's "net profit." See Amended Complaint, Exhibit B. Sherman learned by the fall of 1984, however, that it was liable for Proto–Vest's lost *gross* profits, an amount substantially greater than the net profits that Sherman had known it might have to pay. *See* Thacher N.T., at 15, 144.

In October, 1985, Sherman terminated its attorney-client relationship with Goldhammer. Thereafter, Sherman hired new counsel, and Sherman and Proto–Vest determined not to proceed with a trial on the damages portion of the patent dispute. They settled the litigation for $1,375,-000.00.

Sherman initiated this malpractice action on March 12, 1986. Goldhammer moved to dismiss the complaint as time-barred. I

granted that motion on April 22, 1987, but gave plaintiff leave to file an amended complaint, which it did on May 11, 1987. Defendants now move for judgment in their favor on the ground that plaintiff has failed to raise a genuine issue with respect to the timeliness of the claims pleaded in its amended complaint.

## II.

In both the original and amended complaints, plaintiff has alleged malpractice claims under contract and tort theories. The amended complaint alleges that the parties had "an express contract of employment whereby Defendants agreed to provide certain advice and to represent Sherman Industries with respect to a patent dispute between Plaintiff and Proto–Vest, Inc.," pursuant to which "Plaintiff directed and instructed Defendants to furnish certain specified legal services and advice." Complaint ¶ 10, 11. Plaintiffs also rely on defendants' professional duty to exercise due care: "by accepting employment by plaintiff in connection with the Proto–Vest patent dispute Defendants agreed to and were bound to exercise the necessary, proper and ordinary skill and knowledge required of them in connection therewith." *Id.* ¶ 13.

The law of Pennsylvania determines the appropriate statutes of limitations applicable to plaintiff's claims. The diversity of the parties' citizenship provides the jurisdictional basis for plaintiff's claims. Plaintiff is a New Jersey corporation. Defendant Joel Goldhammer is a citizen of Pennsylvania, and Seidel, Gonda & Goldhammer, P.C. is a Pennsylvania business. A federal court sitting in diversity applies the forum state's choice-of-law rules. A Pennsylvania court would apply the Pennsylvania statute of limitations because Pennsylvania is the forum. *See Ross v. Johns–Manville Corp.*, 766 F.2d 823 (3d Cir.1985); *Lustgarten v. Merrill Lynch*, 528 F.Supp. 1125 (E.D.Pa. 1981).[4] Pennsylvania has a four-year limi-

**4.** The exception to that rule would be if the cause of action arose elsewhere and the limitations period provided by the law of the foreign state were shorter than that provided by the law of Pennsylvania. *See Ross,* 766 F.2d at 828. The cause of action in this case arose in the state where the parties entered into the agreement by which Sherman retained Goldhammer,

tations period for "an action upon an express contract not founded upon an instrument in writing" or "an action upon a contract implied in law." 42 Pa.C.S. § 5525. A two-year statute of limitations applies to "any ... action or proceeding to recover damages for injury to person or property which is founded on negligent ... or otherwise tortious conduct." 42 Pa.C.S. § 5524(7).

Under Pennsylvania law, both contract and tort theories provide appropriate frameworks for claims of legal malpractice. As Judge Spaeth explained in *Duke & Company v. Anderson*, 275 Pa.Super. 65, 418 A.2d 613, 615 (1980):

> ... the client has a choice: either to sue the attorney in assumpsit, on the theory that the attorney in failing to follow specific instructions committed a breach of contract; or to sue the attorney in trespass, on the theory that the attorney failed to exercise the standard of care that he was obliged to exercise.

A plaintiff may combine tort and contract claims in one malpractice complaint, as Sherman has done in this case, by asserting that defendants have breached both specific contractual terms and a general lawyers' duty of care. *See Guy v. Liederbach*, 501 Pa. 47, 459 A.2d 744, 748 (1983).

One important limitation on pleading malpractice claims in Pennsylvania under a contract theory, however, is that a malpractice plaintiff may not sidestep the two-year limitation on tort actions by pleading tort claims as breaches of contract. *See Stetson v. Carty*, Civil Action No. 83–6071

(E.D.Pa. July 18, 1984), aff'd, 760 F.2d 261 (3d Cir.1985). As Chief Judge Fullam explained in *Stetson*, if allegations of a contractual relationship between plaintiff and defendants, and of an express or implied term of the contract establishing an obligation to exercise reasonable care, were to suffice to state a breach-of-contract malpractice case, "the two year limitations statute for tort actions would be a dead letter in ... malpractice cases." *Id.*, slip op. at 3.

■ In sum, to sustain a claim of tortious malpractice, plaintiff must raise an issue whether defendants failed to exercise the standard of care that a reasonable attorney would exercise under the circumstances. *Trice v. Mozenter*, 356 Pa.Super 510, 515 A.2d 10, 13 (1986). To sustain a claim of legal malpractice that arises from a breach of contract, a plaintiff must show that there was a contract, and "that the defendant breached a *specific* provision thereof." *Lactaid v. Youtie*, Civil Action No. 85–6751 (E.D.Pa. March 18, 1986) [Available on WESTLAW, 1986 WL 3587], *aff'd* 806 F.2d 253 (3d Cir.1986) (emphasis in original). Thus, in order to distinguish a contract malpractice claim from a tort claim, the plaintiff claiming under a contract theory must raise an issue as to whether it specifically instructed the defendant to perform a task that the defendant failed to perform, or as to whether the defendant made a specific promise upon which plaintiff reasonably relied to its detriment.[5]

because the complaint is based on the alleged breach of the professional obligations flowing from that retainer. It is not clear from the complaint's allegations whether the retainer originated in Pennsylvania or in New Jersey, but in any event, the New Jersey six-year statute of limitations for malpractice is longer than the applicable Pennsylvania limitations periods and therefore would not come within the exception to Pennsylvania's general rule.

**5.** In ruling orally from the bench on defendants' first dispositive motion, I found the allegations of the original complaint insufficient to sustain either of plaintiff's claims absent amendment. *See* Order of April 22, 1987. The original complaint failed to state a contract claim because it did not allege specific instructions by Sherman

to Goldhammer. I held that a malpractice plaintiff is required to show that a lawyer disobeyed a specific instruction from the client in order to establish a contract-based malpractice claim. The deficiency of the original complaint in asserting the tort claim was its failure to allege facts—which plaintiff asserted at oral argument did exist—that would support a finding that the statute of limitations was tolled until plaintiff learned of the magnitude of damages to which it was vulnerable. I held then that, under the circumstances of this case, the plaintiff must plead a radical difference between the damages picture at the time of appeal and later, during post-appeal discovery, in order to support a finding that the statute of limitations was tolled under the discovery rule.

## III.

There is no dispute that if plaintiff had stated a contractually based legal malpractice claim, such a claim would not be barred by the four-year statute of limitations. Four years prior to filing its suit against Goldhammer in March of 1986, plaintiff had not yet lost its patent suit in the district court and therefore had not yet suffered the actual loss that is an essential element of a legal malpractice claim. *See Duke & Co. v. Anderson,* 418 A.2d at 617. It therefore cannot reasonably be argued that plaintiff's contract claim had accrued as of that time. The question defendants raise with respect to the contract claim is rather whether plaintiff has a viable claim on the merits based on a contract theory.

█ The original complaint failed to state a contract claim because it did not allege specific instructions by Sherman to Goldhammer. The amended complaint, in contrast, does allege that plaintiff gave defendants specific instructions: Plaintiff alleges that Sherman's officers specifically asked defendants to advise them whether there was any possibility that Proto–Vest's patent was valid and that Sherman's blower infringed it, and, after the adverse district court decision, whether there was any possibility that the court of appeals would not overturn the district judge's ruling. Amended Complaint ¶¶ 27(a), (b), (g). In paragraph 27(d) of the amended complaint, plaintiff alleges that it specifically instructed defendants to advise it if there were any modifications to Sherman's model 1885 blower that would avoid Proto–Vest's patent infringement counter-claim. It alleges in paragraphs 27(e) and (f) that it specifically instructed Goldhammer to advise it of any possibility that Sherman would be liable for damages, and if so, how much, and how they would be calculated. Plaintiff appears by these allegations to have cured the pleading deficiency of its contract count that was brought to light by defendants' first motion. The issue now is whether this count survives under the summary judgment standard.

█ Defendants contend in their current motion that all of the allegations of specific instructions that plaintiff added to the complaint in order to bolster the contract claim are contradicted by the evidence of record. Defendants point out that plaintiff's allegation that it instructed Goldhammer to inform it of any modification plaintiff might make in its product to avoid patent infringement is contradicted by the testimony of Sherman's President, Mr. Thacher, that he neither discussed with Goldhammer, nor considered, modifying Sherman's blower design. *See* Thacher N.T. at 98, 129–131. *See also* deposition testimony of Frederick M. Grauer, Sherman Industries' Vice President of Marketing and Sales [hereinafter Grauer N.T.], at 77 (affirming that he never asked Mr. Goldhammer about changing the model 1885 design before June 1983, and failing to provide any testimony that he did inquire after that time about design alternations); deposition testimony of Carl C. Beer, Sherman Industries' Vice President of Engineering [hereinafter Beer N.T.], at 27, 77 (affirming that he never asked about any options available to Sherman other than litigating). Defendants also point out that the allegations that plaintiff specifically asked for advice about the possibility of damages and the appropriate mode of calculating them are contradicted by Thacher's deposition statement that he did not recall asking for advice on the consequences of losing, or on his options in that event. *See* Thacher N.T., at 111, 165–69. *See also* Grauer N.T., at 41–42, 51 (affirming that he never asked Mr. Goldhammer how much the suit against Proto–Vest might cost Sherman, or what the measure of damages would be); Beer N.T., at 65 (affirming that he never asked anyone what the damages would be if Proto–Vest had a valid counter-claim). Sherman's allegation that, despite instruction, Goldhammer failed to inform Sherman of the possibility of losing is contradicted by testimony that, rather than asking about the strengths and weaknesses of their position, Sherman's officers passively awaited advice from Mr. Goldhammer. *See* Thacher N.T., at 68, 108–10, 129, 151, 165; Grauer N.T., at 40–42, 45, 80, 130–32, Beer N.T., 27, 43, 53, 82.

In response to defendants' contentions, plaintiff does not provide any support for the amended complaint's allegations of a contract based on specific instructions, but instead offers a new characterization of its amended Count I as based on an implied contract.[6] Plaintiff's position is that defendants' relationship to Sherman Industries gave rise to an understanding about what was expected of defendants, and that this understanding created contractual duties more particular than those established by the law of attorney negligence.

Plaintiff's theory that defendants breached an implied contract has a certain logic in view of general principles of contract law. Plaintiff has not, however, established any basis for its position in Pennsylvania law on legal malpractice, nor has it explained why this court should depart from Judge O'Neill's holding in *Lactaid*, which required that a malpractice count sounding in contract must be based on a specific instruction.

In addition to having failed to establish a legal basis for its new theory of the contract count, plaintiff has not shown facts in the record that could support a finding that there was any special understanding between the parties that went beyond an ordinary expectation by a client that its lawyer will take the appropriate steps to keep it fully informed and advise it to the extent the lawyer deems necessary to best serve the client's interests. For these reasons, the contract count will be dismissed.

## IV.

The problem presented by defendants' motion to dismiss the tort count is that it cannot reasonably be concluded on the basis of the facts of record that the tort claim accrued less than two years before plaintiff filed its malpractice complaint.[7] As a general rule, "a cause of action arises or accrues ... when the plaintiff could have first maintained the action to a successful conclusion." *Trice v. Mozenter*, 515 A.2d at 13, *quoting Kapil v. Assoc. of Pa. State College and Univ. Faculties*, 504 Pa. 92, 470 A.2d 482, 485 (1983). A plaintiff has a claim of legal malpractice based on its lawyer's negligence as soon as the lawyer has breached his professional duty of care and has thereby harmed the client. *Id.* Goldhammer's allegedly tortious failures to inform Sherman harmed Sherman when it lost its case against Proto–Vest, or, at the latest, when it lost the appeal on February 29, 1984.[8] Therefore, unless the two-year

---

**6.** Sherman does not even purport to point to evidence that it specifically instructed Goldhammer *to give advice that he then neglected to* give, however. Instead, plaintiff contends as follows:

> Defendant's memorandum cites many excerpts from deposition testimony to support the proposition that because Sherman did not specifically *ask* Mr. Goldhammer to do a particular act or to provide a certain item of advice that it had not made out a contract breach cause of action for malpractice. However, as will be developed at trial, the relationship between the parties and the specific, limited dispute in question ... created a specific contractual arrangement between plaintiff and defendant. Defendant understood the implied (if not expressed) directions to him and the precise functions to be carried out by him as a result.

*Id.* at 37–38. Plaintiff reiterates the same argument with respect to whether it asked for advice regarding blower redesign and potential damages:

> The mere fact that [Goldhammer] was not specifically asked on a particular occasion to provide this information cannot eradicate his knowledge that such information should have been supplied ...

*Id.* at 43.

**7.** The record in this case clearly does raise an issue on the merits of plaintiff's tort claim—i.e. whether defendants' advice to plaintiff regarding patent invalidity and non-infringement was tortiously negligent. The evidence of record, viewed in the light most favorable to plaintiff, shows that Goldhammer failed fully to inform Sherman's officers of the risks of suing Proto–Vest, and of available alternative courses of action.

**8.** *See Garcia v. Community Legal Services Corporation*, 362 Pa.Super. 484, 524 A.2d 980 (1987). Judge Cirillo in *Garcia* stated in dictum that he was not called upon to resolve the open question of Pennsylvania law whether the statute of limitations ran from the time of the decision at trial or was tolled pending the decision on appeal. *But see Bowman v. Abramson*, 545 F.Supp. 227 (1982) (holding that plaintiff's legal malpractice claim was not ripe until the appeal had been exhausted because plaintiff's harm remained speculative until then).

limitations period was tolled, it expired before Sherman filed its malpractice suit on March 12, 1986.

Plaintiff recognizes that if its only harm occurred when it lost the Proto–Vest litigation, and if the limitations period was not tolled, its tort claim would be time-barred.[9] Plaintiff asserts, however, that it was unable even by the time that the appeal was decided to appreciate the full extent of its loss, and that the limitations period was therefore tolled under the "discovery rule" until such time as Sherman's officers learned the measure of the damages for which the company was liable.

The discovery rule "arises from the *inability* of the injured, *despite the exercise of due diligence,* to know of the injury or its cause." *Pocono International Raceway, Inc. v. Pocono Produce, Inc.,* 503 Pa. 80, 468 A.2d 468, 471 (1983) (emphasis in original). *See Trice v. Mozenter,* 515 A.2d at 15; *Skyline Builders, Inc. v. Kellar,* 50 D & C 2d 19, 25 (C.D. Lehigh Cty.1970). The discovery rule ordinarily is applied in cases in which a plaintiff is unaware initially that it has been harmed, but is inapplicable where a plaintiff knows of the harm, but not of the extent of it. *See, e.g., Shadle v. Pearce,* 287 Pa.Super. 436, 430 A.2d 683 (1981); *Lactaid v. Youtie,* No. 85–6751. Even late discovery of a major increase in the extent of harm does not toll the limitations period. *See Shadle,* 430 A.2d at 686; *Lactaid* slip op. at 2–3.

Based on the record in this case, it cannot reasonably be controverted that Sherman's officers knew more than two years before they filed suit that Goldhammer's advice had substantially harmed Sherman. Mr. Thacher testified that he understood by the time Sherman lost its appeal that Mr. Goldhammer had wronged Sherman by having been overly optimistic in his assurances that Sherman would win the suit against Proto–Vest. If plaintiff therefore knew or should have known in February of 1984 that it had been harmed by Gold-

hammer's advice, and merely failed to appreciate until later that year how much that wrong advice had cost it, the limitations period was not tolled.

■ Plaintiff, however, suggests that the disclosure in the fall of 1984 of the measure of Proto–Vest's damages constitutes a harm separate from the loss of the suit against Proto–Vest, and that the existence of that second harm distinguishes its case from those in which a plaintiff knows it has been harmed but only later learns of the extent of the harm. Plaintiff contends that "[t]he failure of Defendant Goldhammer does not relate only to the *amount* of damages in question, but to the *fact* of the existence of those damages insofar as they relate to lost profits rather than merely reasonable royalties." Memorandum of Law of Plaintiff Contra Defendants' Motion to Dismiss, at 10. In other words, in plaintiff's view, the difference between what it initially thought it had lost and what it ultimately paid was so great that the latter should be viewed as a second, separate harm. Plaintiff contends that because Sherman's officers were reasonably unaware of the measure of damages until after Goldhammer had conducted research and discovery regarding damages, the limitations period on the second harm was tolled under the discovery rule until fall of 1984.

I suggested in my bench opinion granting defendants' first motion to dismiss that this issue could not properly go to a jury unless plaintiff had evidence that an accurate measure of damages was fifteen or twenty times what plaintiff had thought it faced. I suggested then that, in the absence of a showing of such a dramatic difference, the calculation of damages could not be viewed as a harm qualitatively distinct from the holding that plaintiff was liable for damages. Because plaintiff has not made such a showing, it must be viewed as having been harmed only once.

---

9. Judge O'Neill specified in *Lactaid* that Pennsylvania courts have not adopted the continuous representation rule, under which a plaintiff's claim for malpractice accrues upon the termination of the professional relationship giving rise to the malpractice dispute. Civil Action No. 85–6751, slip op. at 2 n. 3. Pennsylvania courts have instead applied the discovery rule to serve a similar purpose in a more case-specific manner.

The question whether, as a matter of law, the disclosure of plaintiff's liability for damages of a type and magnitude unanticipated when plaintiff lost its suit might constitute a separate harm, and therefore warrant a separate application of the discovery rule, is not presented by the record in this case. Plaintiff has not shown on the record that the difference between what it thought it would owe and what it ultimately paid is of an order of magnitude that would justify characterizing plaintiff's liability for lost gross profits as a harm wholly distinct from that which plaintiff initially perceived. Plaintiff's officers have at various stages contended that they initially understood that the most they stood to lose was a reasonable royalty, and only during damages discovery learned that Proto–Vest sought lost profits, too. *See* Amended Complaint, ¶ 34(a). It cannot reasonably be concluded from the record, however, that Sherman's officers were unaware until mid–1984 that they might have to pay some measure of lost profits. Sherman's officers were informed prior to the appeal that they might have to pay lost profits. The record raises an issue only whether plaintiff reasonably remained unaware until the fall of 1984 that profits would be calculated as *gross* rather than *net* profits.

I do not find the difference between the two types of lost profits to be such that plaintiff's exposure to damages for lost gross profits constitutes a harm wholly distinct from the underlying liability. After the district judge found plaintiff liable, plaintiff learned it might have to pay for some lost profits, but nonetheless waited more than two years before filing suit. In monetary terms, the size of the discrepancy between gross profits and the net profits that plaintiff first believed it might have to pay is not so great as to demand that the disclosure of plaintiff's liability for lost gross profits be viewed as a separate harm. Mr. Thacher testified that before damages discovery, the most he understood Sherman might have to pay was between $200,000 and $500,000. Thacher N.T., at 161–62. After September 5, 1984, when plaintiff received the first reports of Proto–Vest's accountant, Mr. Correll, Mr. Goldhammer revised his damages estimate upward to between $1,300,000 and $1,580,000. Thacher N.T. at 162. Plaintiff eventually paid $1,375,000 to settle the litigation. Thus, Sherman ended up paying almost three times more than what Sherman's officers had originally understood to be the maximum exposure to damages.

Although the discrepancy that plaintiff has shown does raise an issue on the merits whether defendants failed to give plaintiff all the information and advice that lawyers in defendants' position are obligated to give, it does not establish that plaintiff was harmed twice. The record indicates that plaintiff did not initially appreciate the extent to which it had been harmed, but under Pennsylvania law such a lack of information has not been held to toll the statute of limitations on a claim of professional negligence. Plaintiff's negligence count accordingly was barred as of February 29, 1986 at the latest, and was untimely when filed on March 12, 1986.

An appropriate order accompanies this memorandum.

### ORDER

For the reasons stated in the accompanying memorandum, defendants' motion to dismiss plaintiff's complaint, which, in view of the evidence in the record, has been treated as a motion for summary judgment, is hereby GRANTED. Judgment is entered in favor of the defendants and against the plaintiff.