Kenneth J. TUMAN and Joan E. Tuman

v.

GENESIS ASSOCIATES; Patricia
A. Mansmann; and Patricia
A. Neuhausel.

Civil Action No. 95–272.

United States District Court,
E.D. Pennsylvania.

April 25, 1996.

Joseph F. Rizzo, Darby, PA, Gary David Ginsberg, Brian P. O'Connor, Law Offices of Gary D. Ginsberg, Mt. Laurel, NJ, for plaintiffs.

Jeffrey R. Lerman, Stephen G. Rhoads, Marianne Bechtle Daniels, Cynthia B. Mac Queen, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, John J. Levy, Montgomery, McCracken, Walker & Rhoads, Cherry Hill, NJ, Cornelia Farrell Maggio Exton, PA, Stephen Ledva, Jr., Edelstein, Mintzer and Sarowitz, Westmont, NJ, David S. Cohen, Edelstein, Mintzer and Sarowitz, Philadelphia, PA, for defendants.

Jeffrey R. Lerman, Marianne Bechtle Daniels, Cynthia B. MacQueen, Montgomery, McCracken, Walker & Rhoades, Philadelphia, PA, John J. Levy, Montgomery McCracken Walker & Rhoades, Cherry Hill, NJ, for Patricia A. Neuhausel.

## MEMORANDUM

PADOVA, District Judge.

Plaintiffs Kenneth J. and Joan E. Tuman instituted this suit against two mental health professionals, Defendants Patricia A. Mansmann and Patricia A. Neuhausel, and their corporate practice, Defendant Genesis Associates, alleging that Defendants breached a contract and committed various tortious acts in treating Plaintiffs' daughter, Diane Tuman, a non-party to this action.[1] Presently before the Court are Defendants Neuhausel's and Genesis Associates' motion for summary judgment pursuant to Fed.R.Civ.P. 56 as to the claims against them, and Defendant

---

1. Plaintiffs' tort claims against Defendant Genesis Associates are based solely upon respondeat superior.

Mansmann's separate motion for summary judgment as to Plaintiffs' claims against her.[2] For the reasons discussed below, I will grant in part and deny in part Defendants Neuhausel's and Genesis Associates' motion, and grant Defendant Mansmann's motion.

## I. BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs filed this lawsuit on Sept. 21, 1994, raising state law contract and tort claims. Plaintiffs allege that they entered into a contract with Defendants in 1990 for Defendants to provide mental health therapy to their daughter, Diane Tuman, then 20 years old, to treat Diane for bulimia and other emotional problems. Defendants treated Diane for a two-year period from 1990 to 1992. Plaintiffs further allege that Defendants provided Diane with substandard care and that the treatment methods Defendants employed with Diane deviated from good and accepted practices in the mental health field.[3]

In summary, Plaintiffs allege the following. Defendants required Plaintiffs to "detach" from Diane for a two-year period, during which time Plaintiffs could not communicate with Diane. During the course of her therapy, Defendants implanted "false memories" in Diane that Plaintiffs sexually assaulted Diane and routinely performed bizarre satanic rituals, including murdering children. Defendants fostered these beliefs in Diane by, for example, stating in group therapy sessions that Diane had been subject to sexual and satanic ritualistic abuse and then urging Diane to identify her abusers. Defendants encouraged Diane to believe these "memories," despite the fact that Defendants never

attempted to independently verify them. Plaintiffs claim that Diane's mental condition deteriorated significantly while treating with Defendants. Moreover, Diane, believing that Plaintiffs are dangerous, fled the area, assumed a new identity, and broke off contact with Plaintiffs; as of the filing of this lawsuit, Plaintiffs had not seen or spoken with Diane in more than two years.

■ Defendants subsequently filed a motion to dismiss Plaintiffs' suit. Applying Pennsylvania law,[4] I denied Defendants' motion with respect to all but two of Plaintiffs' causes of action in July 1995. 894 F.Supp. 183 (E.D.Pa.1995).[5] The surviving counts of Plaintiffs' Amended Complaint raise claims against all three Defendants for: (1) negligence; (2) breach of contract; (3) defamation; (4) intentional infliction of emotional distress; (5) misrepresentation; and (6) punitive damages. The parties have now completed discovery, and the case is scheduled for trial next month.

## II. STANDARD OF REVIEW

■ Fed.R.Civ.P. 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is sufficient evidence with which a reasonable jury could find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Furthermore, bearing

---

2. By motion, Defendant Mansmann also joined in Defendants Neuhausel's and Genesis Associates' motion, and incorporated all arguments made by Defendants Neuhausel and Genesis Associates as if they were her own.

3. According to the Amended Complaint, at the time of Diane's treatment, Defendant Mansmann was a licensed psychologist and Defendant Neuhausel was a licensed social worker.

4. Jurisdiction is based on diversity, as Plaintiffs are New Jersey residents and Defendants reside or have a principal place of business in Pennsylvania.

A district court sitting in diversity must apply the law of the state in which it sits to the facts of the case. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The parties agrees that Pennsylvania law governs this case.

5. I dismissed with prejudice Plaintiffs' interference with filial relations claim. *Id.* at 189–90. I dismissed without prejudice Plaintiffs' negligence claim because they had failed to allege physical injury as is required under Pennsylvania law, and granted leave to Plaintiffs to file an amended complaint, *id.* at 189, which they did.

in mind that all uncertainties are to be resolved in favor of the nonmoving party, a factual dispute is only "material" if it might affect the outcome of the case. *Id.* Rule 56(c) directs summary judgment "after adequate time for discovery ... against a party who fails to make a showing sufficient enough to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

## III. DISCUSSION

### A. Negligence Claim

Plaintiffs contend that through negligent treatment of Diane, Defendants breached their duty of care to Plaintiffs [6] and thereby caused harm to them. Specifically, Plaintiffs assert that Defendants were negligent because they implanted and/or fostered false memories in Diane of sexual and satanic ritualistic abuse by her parents without ever attempting to ascertain whether these allegations were true, and then terminated therapy with Diane at a time when these beliefs were entrenched in Diane's mind. Plaintiffs contend that because Diane has severed all contact with them and has told others, including the police, that Plaintiffs engage in such practices, Plaintiffs have suffered severe emotional distress which has manifested itself in the form of depression, anxiety, sleeplessness, weight gain, hypertension, and sexual dysfunction.

Defendants move for summary judgment on the negligence claim, asserting four separate grounds. First, the claim is time-barred. Second, Plaintiffs will be unable to establish at trial that Defendants' methods deviated from good and accepted practices in the mental health field, because Plaintiffs' expert testimony is inadmissible as a matter of law. Third, Defendant Mansmann argues that Plaintiffs will be unable to prove at trial

that the alleged deviation in Defendants' treatment of Diane caused Plaintiffs' alleged injuries, because Plaintiffs' expert report does not opine as to a causal link between the deviation and the alleged physical injuries. Fourth and finally, Defendant Mansmann asserts that Plaintiffs' negligence claim must fail because Pennsylvania courts only recognize a cause of action for negligent infliction of emotional distress in "bystander" cases. Defendant Mansmann also moves separately for summary judgment as to the negligence claim against her, asserting that there is no evidence that she specifically undertook to treat Diane for Plaintiffs or that she was involved in a therapeutic relationship with Diane. I will address each of these arguments in turn.

### 1. Is the claim time-barred?

■■■ Plaintiffs' negligence claim is governed by the two-year statute of limitations set forth in 42 Pa.C.S.A. § 5524 (West 1995). "This two year period begins to run 'as soon as the right to institute and maintain a suit arises; lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations.'" *A. McD. v. Rosen*, 423 Pa.Super. 304, 621 A.2d 128, 130 (1993) (citing *Pocono Int'l Raceway v. Pocono Produce, Inc.*, 503 Pa. 80, 468 A.2d 468, 471 (1983)). An individual asserting a claim must use "all reasonable diligence" to become informed of all the facts and circumstances possibly giving rise to a right of recovery, and then file his/her complaint before the limitations period has run. *Id.*

■■ A judicially-created device called the "discovery rule" applies to toll the running of the statute of limitations when the plaintiff is unable, "despite the exercise of diligence, to determine the existence of the injury or its cause." *Stauffer v. Ebersole*, 385 Pa.Super. 306, 560 A.2d 816, 817 (citations omitted), *app. denied*, 524 Pa. 622, 571 A.2d 384 (1989).

---

**6.** Plaintiffs argue that although Diane was Defendants' patient, Defendants also owed a duty of care to Plaintiffs. In my July 1995 opinion, after reviewing Pennsylvania law on professional malpractice, I predicted that the Pennsylvania Supreme Court would conclude that a therapist owes a duty of reasonable care to a patient's parent, where (1) the therapist specifically undertook to treat the child for the parents; (2) the parents relied upon the therapist; (3) the therapist was aware of the parents' reliance; and (4) it was reasonably foreseeable that the parents would be harmed by the therapist's conduct. 894 F.Supp. at 188.

*Accord A. McD.,* 621 A.2d at 130 (noting that discovery rule may apply to toll the statute of limitations "[i]n those circumstances where the plaintiff cannot reasonably be expected to be aware of the injury or of its cause") (citing *Pocono Int'l Raceway v. Pocono Produce, Inc.,* 503 Pa. 80, 468 A.2d 468, 471 (1983)). Under the discovery rule, the statute of limitations begins to run when the plaintiff knows or reasonably should know, first, that an injury has occurred and, second, another party's conduct caused the injury. *A. McD.,* 621 A.2d at 130 (citation omitted); *Stauffer,* 560 A.2d at 817 (citations omitted). In other words, the period begins to run when the individual has " 'sufficient critical facts to put him on notice that a wrong has been committed and that he need investigate whether he is entitled to redress.' " *A. McD.,* 621 A.2d at 130 (citations omitted).

Defendants argue that by July 1992 at the latest, Plaintiffs knew all the facts necessary to initiate suit against Defendants for malpractice and the other claims raised in this action. Alternatively, Defendants contend that Plaintiffs had sufficient knowledge of salient facts by July 1992 to impose on Plaintiffs a duty to investigate whether Defendants caused injury to them; Plaintiffs, however, failed to exercise reasonable diligence and, therefore, the discovery rule does not apply to toll the limitations period.

In support of their argument, Defendants point to the following deposition testimony. Kenneth Tuman testified that events in the spring of 1992 led to the "culmination" in his thinking that something was "not right" about Defendants' treatment methods. Plaintiffs received a call from Diane that she had been hospitalized on an emergency basis for about ten days on the same day that Plaintiffs received a bill from the hospital. Upset that Defendants had not called them to tell them of Diane's emergency hospitalization, Plaintiffs called Defendant Neuhausel

to find out more about why Diane had been hospitalized. Defendant Neuhausel refused to give them any information. K. Tuman dep. at 142–44. Also in the spring of 1992, Plaintiffs consulted a therapist, who expressed the view that it was wrong for Defendants to exclude Plaintiffs from Diane's therapy and that Plaintiffs should have been included in the process. K. Tuman dep. at 104–05, 361; J. Tuman dep. at 198–99. Frustrated that they had so little knowledge about Diane and the nature of her therapy, Plaintiffs stopped sending money to Diane to pay for her therapy that spring. K. Tuman dep. at 387–88; J. Tuman dep. at 196–97.[7]

Then, in July 1992, Diane arrived at Plaintiffs' home, claiming that she was being pursued by members of a satanic cult and that she would have to flee because she was in danger. K. Tuman dep. at 9–10, 30. Plaintiff Kenneth Tuman testified that although he did not believe Diane's stories about the satanic cult, Plaintiffs helped Diane prepare to leave the area. K. Tuman dep. at 21–25, 31–32. After staying with Plaintiffs for approximately ten days, Diane left Plaintiffs' household, claiming that she had seen the cult members in the area. K. Tuman dep. at 366–67. Plaintiffs knew at that time that part of the money Diane used to flee from the Tumans' home came from "donations" from others in the Genesis network. K. Tuman dep. at 130–31. They also knew that Diane and Defendant Neuhausel had made a complaint to police in Pennsylvania about the alleged cult that was pursuing her. K. Tuman dep. at 106. Based on this, Plaintiff Kenneth Tuman testified that he knew that Defendant Neuhausel had to have some knowledge about Diane's flight. K. Tuman dep. at 107, 135. The day after Diane left, a New Jersey state police officer came to Plaintiffs' house to investigate a report that someone was after Diane. K. Tuman dep. at 71–74.[8] Plaintiffs never attempted to contact

---

7. Defendant Mansmann argues that the Tumans were on notice even earlier, when in 1990 they attended a lecture and later approached the lecturer to ask about the appropriateness of detachment therapy. K. Tuman dep. at 278–79. However, given that Diane only started therapy with Genesis in 1990, I conclude that the discussion with the lecturer in 1990 would be insufficient to

put Plaintiffs on notice that they were being harmed by Genesis' treatment methods.

8. Defendants cite to this part of Kenneth Tuman's deposition as proof that the officer told them that day that Diane filed a complaint with the New Jersey state police that Plaintiffs were subjecting Diane to satanic ritualistic abuse.

Defendant Neuhausel or otherwise investigate to determine Defendants' involvement in Diane's flight. K. Tuman dep. at 132–139.

Plaintiffs contend that the statute of limitations did not start to run until January 1994. Plaintiffs point to their own deposition testimony where they testified that they did not learn that Diane was accusing them of abuse until they traveled to Colorado in November 1992 in an attempt to find Diane. K. Tuman dep. at 66–74; J. Tuman dep. at 369–73. Plaintiffs claim that even after the November 1992 trip, they had no reason to believe that Defendants had anything to do with Diane making these accusations against Plaintiffs. Plaintiffs learned for the first time in January 1994 that Diane had made similar accusations against them in her group therapy sessions at Genesis, when they attended a meeting of the False Memory Syndrome Foundation and met other former Genesis clients. K. Tuman dep. at 109, 117–18, 176, 398–99; J. Tuman dep. at 377–78. It was at this point in time that Plaintiffs argue they were on notice that Defendants had caused them injury.

█ As an initial matter, it is important to separate two distinct issues: when Plaintiffs became aware, or reasonably should have been aware, that Defendants' treatment was harmful to Diane, as contrasted to when Plaintiffs knew or should have known that Defendants' actions were causing injury to Plaintiffs. Plaintiffs' deposition testimony indicates that they were aware in the spring and summer of 1992 that something was not right about Defendants' treatment methods and that Diane was unwell. Plaintiffs, however, do not seek to recover on their negligence claim for injuries suffered by Diane but, instead, for injuries allegedly inflicted on them by Defendants' treatment of Diane.[9]

Specifically, Plaintiffs contend that Defendants' negligent treatment of Diane harmed Plaintiffs because it caused Diane to believe that her parents subjected her to sexual and satanic ritualistic abuse, prompting Diane to flee from her parents and make false reports about Plaintiffs to the police. This in turn led Plaintiffs to suffer great emotional distress.

According to Plaintiffs' deposition testimony, when Diane was home in July 1992, family relations were good and they engaged in a number of activities together, such as going out to eat and playing tennis. J. Tuman dep. at 42. Plaintiffs and Diane attended a session together with the therapist who Plaintiffs had consulted about Diane's treatment; during that session Diane discussed her therapy at Genesis, her hospitalization that past spring, and issues of sexual abuse. K. Tuman dep. at 362–63; J. Tuman dep. at 66–67. And it was during her July 1992 visit that Diane told Plaintiffs that she had been sexually abused by an uncle when she was younger. K. Tuman dep. at 354–56. On this testimony, a factfinder could decide that in July 1992 Plaintiffs did not have reason to suspect that Defendants' treatment of Diane had caused Diane to believe that Plaintiffs were abusing her.

Plaintiffs further testified that they did not contact Defendant Neuhausel after Diane fled because Defendant Neuhausel refused to give them any information about Diane when they had contacted her in the past. K. Tuman dep. at 132, 142–43; J. Tuman at 150. Moreover, Plaintiffs took certain actions after Diane fled in July 1992 that could support the conclusion that they exercised reasonable diligence in determining if they were harmed by Defendants' conduct. Plaintiffs called the New Jersey state police about one week after they came to Plaintiffs' home to investigate a

---

This is a misstatement of the deposition testimony. At p. 70, Plaintiff Kenneth Tuman states that it was not until Plaintiffs went to Denver in November 1992 that they learned for the first time that Diane was making these accusations against Plaintiffs and not third parties. Also, at p. 8 of her deposition, Plaintiff Joan Tuman states that after they returned from Denver in November 1992, they contacted the New Jersey state police and gave them a written account of the events of July 1992 leading up to Diane's

disappearance; they did this because the information they received in Colorado led them to believe that they were under investigation by the New Jersey state police. *See also* J. Tuman dep. at 386.

9. Plaintiffs' breach of contract claim, by contrast, is premised on Plaintiffs' allegation that Defendants provided substandard care to Diane and that this constituted a breach warranting contract damages.

report that Diane was being threatened; Plaintiffs asked for more information about the report, but the police would only tell them that the complaint originated from Pennsylvania. J. Tuman dep. at 9–10. Plaintiffs also went to Colorado in November 1992 in an attempt to locate Diane after receiving a report that Diane was living there. J. Tuman dep. at 369–73. Plaintiffs met with law enforcement officials in Colorado who told Plaintiffs that Diane was under a therapist's care; Plaintiffs asked for the therapist's name but the police would not provide that information. J. Tuman dep. at 45–47. The Colorado police then advised Plaintiffs not to make any further attempts to find Diane; Diane had filed a complaint alleging that Plaintiffs were stalking her, and the police told Plaintiffs that Diane could have them arrested if they came into contact with her. K. Tuman dep. at 391; J. Tuman at 51–52.

On the record as a whole, I conclude that there is a genuine issue of material fact as to when Plaintiffs knew or reasonably should have known that they themselves were injured by Defendants' treatment of Diane. A reasonable factfinder could find that the earliest that Plaintiffs had knowledge or constructive knowledge was in November 1992. Alternatively, a factfinder could determine that Plaintiffs had sufficient knowledge by July 1992 to impose a duty on Plaintiffs to investigate whether Defendants caused injury to them, but that Plaintiffs exercised reasonable diligence in investigating Defendants' role. *See Stauffer,* 560 A.2d at 819 (holding that summary judgment should not be granted if there is a question of fact as to whether plaintiff exercised reasonable diligence in investigating the cause of his/her injury).

Because I cannot conclude that the undisputed facts establish that the time it took for Plaintiffs to discover that they were injured by Defendants' actions was unreasonable as a matter of law, this claim must proceed.

### 2. Admissibility of Opinion of Plaintiffs' Expert

█ Defendants correctly note that Pennsylvania law requires Plaintiffs to introduce expert testimony to establish their claim that Defendants' actions deviated from the applicable standard of care. *See Mitzelfelt v. Kamrin,* 526 Pa. 54, 584 A.2d 888, 892 (1990) (citation omitted); *Hoffman v. Mogil,* 445 Pa.Super. 252, 665 A.2d 478, 481 (1995) (citation omitted). Defendants contend that Plaintiffs will be unable to sustain this burden at trial because the report of their expert, Elliot Atkins, Ed.D., a licensed psychologist, indicates that he did not base his opinions on a review of Diane's treatment records or any other information about Defendants' treatment of Diane and her condition.

Instead, Defendants argue that the report demonstrates that Dr. Atkins bases his opinion that Plaintiffs' treatment of Diane deviated from good and acceptable practices amongst mental health therapists almost exclusively on Plaintiffs' allegations, the allegations of nonparties who are suing Defendants in unrelated actions, and the findings of licensing boards in unrelated actions against Defendants. Because these sources are biased and unreliable, Defendants assert that the expert's opinions are inadmissible, citing in support *Viterbo v. Dow Chemical Co.,* 826 F.2d 420, 423–24 (5th Cir.1987) (holding that expert report was properly excluded by district court because it was based primarily on statements by plaintiff that defendant's product was only possible source of plaintiff's injuries) and *Faries v. Atlas Truck Body Mfg. Co.,* 797 F.2d 619, 623–24 (8th Cir.1986) (holding that district court properly excluded police officer's testimony as to cause of accident because officer's opinion was based solely on interview of one of the drivers involved in the accident).

Plaintiffs point out that Defendants fail to fully list the materials which their expert reviewed, which include the depositions of Plaintiffs, Defendants, and individuals who participated in group therapy with Diane and Defendants; letters from Diane to Plaintiffs containing comments about her therapy with Defendants; reports made by Defendants Neuhausel and Diane to law enforcement officials; and literature written by Defendants Neuhausel and Mansmann about their treatment methods. Plaintiffs correctly argue that *Viterbo* and *Faries* do not apply

here to preclude admission of their expert's opinion. The court in both of those cases excluded the expert's opinion because it relied almost exclusively on information from one source who was clearly biased. *Viterbo,* 826 F.2d at 423–24; *Faries,* 797 F.2d at 623–24. By contrast, Plaintiffs' expert in the instant case consulted various materials, including information provided by Defendants, in rendering his opinion.

▆▆▆ As the *Viterbo* court itself noted, "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." 826 F.2d at 422 (citation omitted). A court should only preclude expert testimony when the sources on which the expert relies are of "such little weight" that the expert's opinion is insupportable. *Id.* The reasoning behind this rule is that a "fundamentally unsupported" opinion offers no assistance to the trier of fact as is required by Fed.R.Evid. 702, and may be more prejudicial than probative and thus inadmissible pursuant to Fed.R.Evid. 403. *Id.* (citations omitted).

▆▆▆ The question thus presented is whether Dr. Atkins had so little reliable information about Defendants' treatment of Diane that his opinion is "fundamentally unsupported" and therefore should not be heard by the jury. After examining the report and the record as a whole, I cannot conclude at this time that Plaintiffs' expert opinion is "fundamentally unsupported" and, therefore, I decline to rule that the opinion is inadmissible.

For example, Dr. Atkins reviewed Defendants' answer and deposition testimony, in which Defendants stated that Diane had multiple and severe emotional problems, to the point that she contemplated suicide, and that her stories about cults were most likely fabricated. Atkins rpt. at 11. Defendants also testified as to their methods for determining if their clients claims of abuse are based in reality. Atkins rpt. at 11–12. Atkins read the depositions of individuals who participated in group therapy sessions with Diane at Genesis. Atkins rpt. at 3. Dr. Atkins consulted an article and a book written by Defendants Neuhausel and Mansmann about their treatment methods, Atkins rpt. at 2, 7; Plaintiff Joan Tuman testified that Defendant Neuhausel referred and sold to Plaintiffs that same book at a meeting about Diane's treatment. J. Tuman dep. at 88. Dr. Atkins consulted two police reports in which Defendant Neuhausel told police, *inter alia,* that Diane was being treated by Defendants because she had been raised in a satanic cult, and that Defendants had terminated Diane's therapy at a Burger King restaurant because she was having contact with her parents. Atkins rpt. at 11, 16–17. Atkins had access to letters written by Diane to Plaintiffs, in which Diane stated, *inter alia,* that Defendants told her that they would not continue to treat her if she had contact with her parents. Atkins rpt. at 6. Dr. Atkins also interviewed Plaintiffs, and reviewed their deposition testimony and other documents prepared by Plaintiffs. Atkins rpt. at 1–2. Plaintiffs, in turn, have testified that they had four or five meetings with Defendant Neuhausel, in which Plaintiffs obtained some limited information about Diane's treatment. K. Tuman dep. at 86–92, 202, 215–16, 305–12, 316–23, 336–41; J. Tuman dep. at 81–93.

From this review, I cannot conclude at this time that Dr. Atkins had so little reliable information about Defendants' treatment of Diane that his testimony would be inadmissible as a matter of law. This is not to say, however, that the Defendants cannot cross examine Dr. Atkins as to the reliability of his opinion given that he did not consult Diane's treatment records.[10] Defendants are free to

---

10. Plaintiffs also contend that Defendants should not be allowed to argue that Plaintiffs' expert testimony is inadmissible on the grounds that the expert did not consult Diane's treatment notes, because Plaintiffs demanded the treatment notes during discovery but Defendants refused to produce them, improperly claiming that they were privileged.

Fed.R.Civ.P. 37 instructs a party to move the court to compel disclosure in the event that s/he believes an opposing party is improperly withholding discovery. I note that Plaintiffs failed to file such a motion to compel during the discovery phase of this case, which ended on Feb. 15, 1996. For this reason, I do not consider this argument by Plaintiffs in my analysis.

cross-examine Dr. Atkins about the extent to which his opinion about Defendants' treatment of Diane relies on information that is unrelated to Diane's treatment. Defendants also may cross examine Dr. Atkins at length about the possible biases of the sources he consulted. Finally, Defendants may question Dr. Atkins about any perceived failure of his report to show how Defendants' treatment methods implanted or fostered false memories in Diane.

### 3. Necessity of expert opinion regarding causation

█ Defendant Mansmann also notes that under Pennsylvania law, a plaintiff suing for malpractice must introduce expert testimony that defendants' deviation from acceptable standards of care proximately caused the injuries claimed by plaintiffs. *Mitzelfelt v. Kamrin*, 526 Pa. 54, 584 A.2d 888, 892 (1990). Defendants contend that Plaintiffs will be unable to sustain this burden at trial because Dr. Atkins' report does not opine as to a causal link between the deviation and Plaintiffs' alleged physical injuries.

█ I first note that this is not a typical medical malpractice case because Plaintiffs were not Defendants' patients; instead, the fact scenario presented here more closely resembles a standard negligence case in which there is no bright-line rule requiring expert testimony to assist the trier of fact in determining the question of causation. For that reason, and because Pennsylvania does not require medical evidence of physical injury to establish a negligent infliction of emotional distress claim, *see Krysmalski v. Tarasovich*, 424 Pa.Super. 121, 622 A.2d 298, 305 *app. denied*, 535 Pa. 675, 636 A.2d 634 (1993), I predict that the Pennsylvania Supreme Court would not require expert opinion on causation in the case at hand.

█ The key question for purposes of a Rule 56 motion is whether Defendants eliminate all genuine issues of material fact on the issue of causation by pointing to the expert's report. I find that they do not. The report

opines that Defendants' conduct has prevented Plaintiffs from maintaining a relationship with Diane, thereby causing Defendants much pain and anguish. Atkins' rpt. at 2, 17.[11] Plaintiffs have testified that they have experienced a number of physical injuries stemming from their emotional distress, including depression, anxiety, sleeplessness, weight gain, hypertension, and sexual dysfunction. K. Tuman dep. at 414–19, 434–35, 442–43, 446–47; J. Tuman dep. at 261–62, 276–77, 284, 327, 332. Therefore, a genuine issue of material fact on the question of causation exists on this record.

### 4. Pennsylvania requirements for claim of negligent infliction of emotional distress

Defendant Mansmann also argues that Plaintiffs' negligence claim must fail because Pennsylvania courts only recognize a cause of action for negligent infliction of emotional distress in situations in which the plaintiff actually observes the defendant injure a close relative, as in *Sinn v. Burd*, 486 Pa. 146, 404 A.2d 672 (1979).

█ While it is true that most Pennsylvania cases involving the tort of negligent infliction of emotional distress are so-called "bystander" cases, *see Armstrong v. Paoli Memorial Hosp.*, 430 Pa.Super. 36, 633 A.2d 605, 611 (1993) (describing the evolution of the torts of negligent and intentional infliction of emotional distress in Pennsylvania and other jurisdictions), *app. denied*, 538 Pa. 663, 649 A.2d 666 (1994), "Pennsylvania also recognizes recovery in situations in which there is a contractual or fiduciary duty." *Id.* 633 A.2d at 615 (citations omitted). In my July 1995 opinion, I concluded that Plaintiffs could demonstrate that Defendants owed them a reasonable duty of care in treating Diane if they established four factors. 894 F.Supp. at 188. By requiring Plaintiffs to first prove the existence of that duty, we avoid "opening the floodgates of litigation" and thus satisfy a key concern driving Pennsylvania's policy of limiting the tort of negligent infliction of emotional distress. *See*

---

11. As Defendants correctly observe, Pennsylvania does not recognize a cause of action for loss of filial relations, and this Court previously dismissed Plaintiffs' claim for loss of filial relations in its July 1995 opinion. 894 F.Supp. at 189–90.

*Armstrong,* 633 A.2d at 615. I therefore predict that the Pennsylvania Supreme Court would allow plaintiffs who establish such a duty of care to recover damages for emotional distress caused by the breach of that duty.

### 5. Negligence Claim as to Defendant Mansmann

Defendant Mansmann separately moves for summary judgment on the negligence claim against her, asserting that there is no evidence that she specifically undertook to treat Diane, or that she committed negligent acts with respect to Diane's treatment. Plaintiffs testified that they had no contact whatsoever with Defendant Mansmann during the course of Diane's treatment at Genesis. K. Tuman dep. at 75, 292–93; J. Tuman dep. at 117. Defendant Mansmann testified that Defendant Neuhausel was Diane's primary therapist, that Defendant Mansmann did not provide individual therapy to Diane, and that her only involvement in Diane's therapy was to participate in group therapy sessions which Diane attended. Mansmann dep. at 45–46. Moreover, Defendant Mansmann notes that Plaintiffs' expert report does not discuss the group therapy sessions and does not offer a specific opinion that the group therapy fell below acceptable standards of care.

Plaintiffs counter that Defendant Mansmann herself testified that she and Defendant Neuhausel each reviewed the therapy records of all Genesis clients and consulted with each other about their treatment. Mansmann dep. at 49, 181. With regard to Diane specifically, in addition to participating in group therapy sessions with Diane, Defendant Mansmann testified that she discussed Diane's termination from therapy at Genesis and attended the meeting at which Diane was terminated. Mansmann dep. at 180–81.

 Defendant Mansmann's deposition testimony could support a finding that she participated to some extent in Diane's treatment. The key issue, however, is whether there is any evidence in the record to establish the elements of a negligence claim against Defendant Mansmann. I find that there is no evidence that Defendant Mansmann specifically undertook to treat Diane, that Plaintiffs relied on that undertaking, or that Defendant Mansmann was aware of Plaintiffs' reliance. As will be discussed *infra,* the record creates a genuine issue of material fact as to whether Defendants Neuhausel and Genesis Associates, as Neuhausel's principal, specifically undertook to treat Diane for Plaintiffs and/or entered into a contract with Plaintiffs; Plaintiffs' deposition testimony describe a series of meetings between them and Defendant Neuhausel. By contrast, Plaintiffs' testimony indicates that there was absolutely no interaction between Plaintiffs and Mansmann. For this reason, I will grant Defendant Mansmann's motion and enter judgment in her favor on Plaintiffs' negligence claim against her.

## B. Breach of Contract Claim

Plaintiffs allege that they formed a contract with Defendants, by which Defendants agreed to provide therapy to Diane to treat her for bulimia and other emotional problems and, in return, Plaintiffs agreed to detach from Diane and pay for the therapy. Plaintiffs further allege that Defendants breached that contract by providing Diane with substandard care.

 Defendants argue that the breach of contract claim must fail because there is no evidence that Plaintiffs were in privity with Defendants or that they entered into an agreement with Defendants. After reviewing the deposition testimony and other evidence in the record, however, I conclude that a genuine issue of material fact exists as to whether Plaintiffs formed a contract with Defendant Neuhausel individually, and on behalf of Defendant Genesis Associates, to provide therapy to Diane.

Plaintiffs testified to the following at their depositions. By her own initiative, Diane started therapy at Genesis in July 1990. K. Tuman dep. at 279. In September 1990, Diane called Plaintiffs to set up a meeting between herself, Plaintiffs, and Defendant Neuhausel; Diane indicated to Plaintiffs that the purpose of the meeting was to discuss financing her therapy. K. Tuman dep. at 305–09; J. Tuman dep. at 81–82. At that meeting, Plaintiffs agreed with Defendant

Neuhausel to totally detach from Diane and committed to financing her therapy for the two-year period. K. Tuman dep. at 86–89; J. Tuman dep. at 81–82. Defendant Neuhausel did not provide specifics about her planned course of treatment for Diane, except it was Plaintiffs' understanding that Defendant Neuhausel would counsel Diane to help her with her problems with bulimia, self-esteem, depression, and suicidal thoughts. K. Tuman dep. 89–91, 202; J. Tuman dep. at 84–85. Plaintiffs understood that Diane was Genesis' patient, and not Plaintiffs; Plaintiffs would not participate in any therapy sessions, nor would they have access to any information about Diane's treatment. K. Tuman dep. at 89–92. Plaintiffs met with Neuhausel again a week or two later, at Plaintiffs' request, to get more information about the proposed detachment therapy. During that meeting, both Defendant Neuhausel and Diane told Plaintiffs that it would be beneficial for Diane to detach from Plaintiffs for two years. K. Tuman dep. at 307–08; J. Tuman dep. at 87–89. Subsequently, some time in 1992, Plaintiffs met again with Defendant Neuhausel and Diane. At that meeting, Defendant Neuhausel and Diane each told Plaintiffs that Diane's therapy would take longer than the original two-year commitment, and asked Plaintiffs if they would continue to financially back Diane. Plaintiffs again agreed to financially back Diane's therapy. K. Tuman dep. at 311–12.

At first, Plaintiffs paid Genesis directly, as they had said they would do during the first meeting with Defendant Neuhausel. J. Tuman dep. at 82–83. Then, at some point in time, Plaintiffs began sending money to Diane directly, because it was their understanding that Defendant Neuhausel wanted Diane to learn to control her own finances. J. Tuman dep. at 82. Plaintiffs paid approximately $10,000 for Diane's therapy until they cut off the payments some time in the spring of 1992. K. Tuman dep. at 413; J. Tuman dep. at 196. During the time that Plaintiffs were paying for Diane's therapy, Plaintiffs also were providing Diane with overall support, including her college tuition, room, board, car insurance, and other medical bills. J. Tuman dep. at 141–43. When asked why they provided this financial support to Diane, Plaintiff Joan Tuman answered that they did it because she was their daughter. J. Tuman dep. at 146.

The only other account of the interactions between Plaintiffs and Defendant Neuhausel to which the parties directed the Court's attention are Defendant Neuhausel's handwritten notes from that initial September 1990 meeting. Pl.'s Mem.Opp., Ex. N. In that document, Neuhausel recorded, *inter alia*, that "Ps need to pay and know for positive [indecipherable] Diane must not see them & follow process for about 2 yrs or so. Must follow to the end or a positive result is impossible & can be very harmful if she doesn't." After a line, the notes continue, "Diane called after session to report her Ps reaction to request for 2 yrs detach and to pay for sessions. Session went well."

Defendants argue that the deposition testimony establishes that Plaintiffs did not intend to enter into a contract with Defendants, but instead agreed with Diane, and not Defendants, to financially support her therapy because she was their daughter. Diane, an adult, sought out Genesis and was treating with Defendant Neuhausel for at least two months before Plaintiffs had any contact with Defendants. Diane then arranged the meetings between Defendant Neuhausel and Plaintiffs because she needed her parents' financial support to continue with the therapy. Moreover, Defendant Neuhausel made no specific promises about the therapy she would provide to Diane.

■ The key question here is whether the facts viewed in the light most favorable to the Plaintiffs could support a reasonable factfinder's conclusion that Plaintiffs formed an oral contract with Defendant Neuhausel.[12]

---

12. Defendants argue that Plaintiffs should not be permitted to pursue their breach of contract claim against Defendants because this case does not fall within the two narrow exceptions recognized by the Pennsylvania Supreme Court to the general rule that a non-client cannot sue a professional for malpractice. *See DiMarco v. Lynch Homes–Chester County, Inc.,* 525 Pa. 558, 583 A.2d 422 (1990) (holding that a third-person in class of persons whose health is likely to be threatened by patient with communicable disease has tort cause of action against treating physi-

To form a contract in Pennsylvania law, there must be: (1) an offer by one party that expresses a willingness to enter a contract; (2) an acceptance by which the second party agrees to be bound by the terms of the offer; and (3) a bargained-for exchange of consideration, i.e., a specific, definite promise by each party to perform some act. *Peoples Mortgage Co., Inc. v. Fed. Nat'l Mortgage Ass'n,* 856 F.Supp. 910, 922–23 (E.D.Pa.1994); *Jenkins v. County of Schuylkill,* 441 Pa.Super. 642, 658 A.2d 380, 383, *app. denied,* 542 Pa. 647, 666 A.2d 1056 (1995); *Schreiber v. Olan Mills,* 426 Pa.Super. 537, 627 A.2d 806, 808 (1993); *Cobaugh v. Klick–Lewis, Inc.,* 385 Pa.Super. 587, 561 A.2d 1248, 1249–51 (1989); *see also Johnston the Florist, Inc. v. TEDCO Constr. Corp.,* 441 Pa.Super. 281, 657 A.2d 511, 516 (1995) (holding that agreement is valid and binding contract if both parties have manifested an intent to be bound by the terms of the agreement, the terms are sufficiently definite and consideration existed, and "[i]n the case of a disputed oral contract, what was said and done by the parties, as well as what was intended by what was said and done by the parties, are questions of fact to be resolved by the trier of fact") (citations omitted).

▮ In the instant case, the evidence could support the finding that: (1) Defendant Neuhausel offered to provide therapy to Diane if Plaintiffs agreed to pay and to detach for a period of two-years: (2) Plaintiffs accepted that offer; and (3) the parties exchanged consideration—Defendant Neuhausel promised to and then did provide therapy to Diane, and Plaintiffs promised to and then did cease contact with Diane and paid for her therapy. Defendants emphasize that Plaintiffs themselves admitted that the reason they financed the therapy was because Diane was their daughter and they wanted to support her. A party's stated motive for entering into a contract, however, is distinct from intent to contract. *See Michael v. Shiley, Inc.,* 46 F.3d 1316, 1326 (3d Cir.) ("The underlying foundation of contract law is the *objectively manifested intentions* of the parties") (emphasis added) (citation omitted), *cert. denied,* —— U.S. ——, 116 S.Ct. 67, 133 L.Ed.2d 29 (1995).

For these reasons, I find that a genuine issue of material fact exists as to whether Defendant Neuhausel, individually and on behalf of Defendant Genesis Associates, formed a contract with Plaintiffs.

▮ By contrast, there is no evidence in the record to support a finding that Plaintiffs formed a contract with Defendant Mansmann, who moves separately for summary judgment on the breach of contract claim against her. As noted *supra,* Plaintiffs testified that they had no contact whatsoever with Defendant Mansmann during the course of Diane's treatment at Genesis. K. Tuman dep. at 75, 292–93; J. Tuman dep. at 117. For this reason, I will grant Defendant Mansmann's motion for summary judgment on the breach of contract claim against her.[13]

cian for giving patient erroneous advice about the risk of spreading the disease) and *Guy v. Liederbach,* 501 Pa. 47, 459 A.2d 744 (1983) (holding that named beneficiaries in will can sue attorney who drafted will for decedent in assumpsit for improperly drafting instrument). *See also Lindgren v. Moore,* 907 F.Supp. 1183, 1187–89 (N.D.Ill.1995) (holding that father and siblings of patient could not sue in tort on allegations of false memory implantation because plaintiffs did not have a "special relationship" with patient as is required under Illinois law).
Plaintiffs allege that they directly contracted with Defendants to treat Diane; they do not argue that they were intended beneficiaries of a contract between Diane and Defendants as was the case in *Guy v. Liederbach.* For that reason, *Guy* is not helpful on the issue of whether the parties in the instant action formed a contract and thus have a cause of action for breach. *DiMarco* and *Lindgren* also are not instructive on

the contract formation question in the instant action, because those cases were solely negligence actions in which the courts were trying to determine if a practitioner owed a duty of care to a non-patient third party.

13. In response to Defendant Mansmann's contention that there is no evidence of a contract between herself and Plaintiffs, Plaintiffs simply respond that Mansmann, as the Genesis psychologist, was "responsible for the acts of employees working under her" and that "she submitted bills under her name." Pls.' Mem.Opp. at 25. Plaintiffs, however, fail to point to any deposition testimony or other evidence in the record to support the claim that Defendant Mansmann was Defendant Neuhausel's employer or supervisor. Moreover, in a later submission, Plaintiffs completely reversed their argument, and stated that Defendant Mansmann was not Defendant Neuhausel's supervisor. Pls.' Post–Argument Mem.

My inquiry does not end here, however, because Defendants further contend that for the reasons set forth above with regard to the negligence claim, Plaintiffs' breach of contract claim is time-barred as well.

As an initial matter, I must determine the statute of limitations period applicable to Plaintiffs' breach of contract claim under Pennsylvania law. Plaintiffs argue the applicability of Pennsylvania's four-year statute of limitations as set forth in 42 Pa.C.S.A. § 5525 (West 1981) governing breach of contract actions. Defendants counter that in professional malpractice cases, Pennsylvania law requires that courts apply the two-year statute of limitations to breach of contract claims, citing in support *Sherman Indus., Inc. v. Goldhammer,* 683 F.Supp. 502 (E.D.Pa.1988) and *Spack v. Apostolidis,* 353 Pa.Super. 362, 510 A.2d 352 (1986).

■ Defendants misread *Sherman.* In *Sherman,* the plaintiff asserted both breach of contract and tort claims in a malpractice suit against his attorney, as is permitted under Pennsylvania law. 683 F.Supp. at 506 (citing *Guy v. Liederbach,* 501 Pa. 47, 459 A.2d 744, 748 (1983)). The *Sherman* court noted that to prevent malpractice plaintiffs from sidestepping the two-year limitation on tort suits, Pennsylvania law requires a plaintiff to make out a distinct contract claim, separate and apart from a tort claim based on the defendant's alleged violation of a professional duty of care. *Id.* (citations omitted). In my July 1995 memorandum, I rejected Defendants' argument that Plaintiffs'

breach of contract claim was a negligence claim in disguise, and specifically found that Plaintiffs' Amended Complaint articulated a breach of contract claim distinct from their negligence claim. 894 F.Supp. at 186–87.[14] And in this opinion, I have found that a genuine issue of material fact exists with respect to the issue of contract formation. As the *Sherman* court itself acknowledged, the four-year statute of limitations governs contractually based malpractice claims. *Id.* at 507.

I further note that *Spack* is distinguishable. In *Spack,* the court held that "[i]nasmuch as appellants have not sought true contract damages in their designated count in assumpsit, but have confined their claim to damages for personal injuries," the two-year statute of limitations applied to bar their claim in assumpsit. 510 A.2d at 355. The *Spack* court found that although the assumpsit count was "couched in contractual terminology," it was really a tort claim because it solely requested personal injury damages. *Id.* By contrast, Count I of Plaintiffs' Amended Complaint seeks true contract damages in addition to damages for pain and suffering. Pls.' Amended Compl., First Count.[15]

I therefore find that the four-year statute of limitations governs Plaintiffs' breach of contract claim. As explained in the negligence section above, Plaintiffs' deposition testimony indicates that by the spring of 1992 they had concluded that there was something wrong with Defendants' treatment

---

at 17. Finally, I note that Plaintiffs have not submitted any bills from Defendant Mansmann with their opposition papers, nor have the pointed to testimony by Plaintiffs that they received such bills.

**14.** I noted a significant difference between this case and the fact-scenario presented in cases such as *Sherman.* In this case, Plaintiffs' contract claim is not based on allegations that Defendants failed to provide *Plaintiffs* with reasonable care; instead, Plaintiffs claim that Defendants breached a contract between Plaintiffs and Defendants by failing to provide *Diane* with adequate care. *Id.* at 186.

I further note that this case is distinguishable because Plaintiffs' negligence claim seeks to recover for alleged injuries suffered by *Plaintiffs* on the theory that Defendants breached a duty of

care that they directly owed to *Plaintiffs;* Plaintiffs do not seek a tort remedy for injuries incurred by *Diane* for any alleged breach by Defendants of the professional duty of care they owed to *Diane.*

**15.** The First Count of the Amended Complaint states in pertinent part:

14. Plaintiffs performed their obligations under said contract by paying Defendants monies in excess of five thousand dollars.

\* \* \* \* \* \*

19. As a result of the conduct of Defendants described hereinabove, Plaintiffs have suffered monetary damages in excess of five thousand dollars and have been caused to suffer emotional and mental pain, discomfort and anguish and will continue to suffer same for an indefinite period in the future.

methods. If the limitations period on their contract claim began to run in the spring of 1992, their Sept. 19, 1994 filing was timely.

For these reasons, I will deny Defendants Neuhausel's and Genesis Associates' motion for summary judgment on the breach of contract claim.

## C. Defamation Claim

As an initial matter, Defendants assert they are entitled to summary judgment because the alleged statements identified by Plaintiffs in their opposition briefs as the bases for their defamation claims were not alleged with sufficient particularity in the Amended Complaint to put Defendants on notice of the statements against which they would have to defend.

Specifically, Plaintiffs stated in their memorandum opposing the instant motions that their defamation claim arises out of: (1) statements allegedly made by Defendant Neuhausel to the West Whiteland Township Police Department in July 1992, Pls.' Mem. Opp., Ex. K; and (2) a statement allegedly made by Defendant Mansmann to a former Genesis patient named Kathy Kelly in July 1992, see K. Kelly dep. at 55–56. Defendants contend that these alleged statements are not encompassed in Count V of the Amended Complaint. They assert that Amended Complaint solely alleges that Diane made certain defamatory statements and sought to hold Defendants liable for these statements on the theory that Diane was their "mouthpiece," and is devoid of allegations that Defendants themselves made defamatory statements. For this reason, Defendants argue that they are entitled to summary judgment on this claim, citing in support *Spain v. Vicente*, 315 Pa.Super. 135, 461 A.2d 833, 836 (1983) (holding that summary judgment on defamation claim was properly entered for defendants where complaint failed to state with particularity the content of alleged statement and to whom the statement was made).

■■■ A federal court sitting in diversity applies the federal rules of civil procedure, even when enforcing the federal rule "alters the mode of enforcing state-created rights." *Hanna v. Plumer*, 380 U.S. 460, 473, 85 S.Ct. 1136, 1145, 14 L.Ed.2d 8 (1965). "Therefore, Federal Rule of Civil Procedure 8(a), and not Pennsylvania law, provides the standard of specificity applicable to plaintiff's defamation claim." *GE Capital Mortg. Serv., Inc. v. Pinnacle Mortg. Inv. Corp.*, 897 F.Supp. 854, 867 (E.D.Pa.1995) (finding that defamation counterclaim was sufficiently specific under the federal rules where it identified the substance of the defamatory statement, names of two individuals who received it, and department within the plaintiff's corporation where it originated from). "Under Rule 8(a), a defamation plaintiff does not have to plead the precise defamatory statements, nor must she specifically name the person who made the statements. So long as the count provides sufficient notice to defendants, it states a claim." *Lynch v. Borough of Ambler*, No. Civ. A. 94–6401, 1995 WL 113290, at *5–*6 (E.D.Pa. March 15, 1995) (finding that allegation that borough council officials announced that plaintiff was fired for violating environmental laws was sufficient to put defendants on notice) (citation omitted).

■■■ Applying the liberal pleading requirements contemplated by the Federal Rules of Civil Procedure, *see Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), I find that Plaintiffs' Amended Complaint was sufficient to inform Defendant Mansmann that Plaintiffs sought to hold her liable for statements she herself uttered to other Genesis clients in group therapy sessions, such as the one she allegedly uttered to Kathy Kelly. By contrast, I find that even applying the liberal pleading requirements, the Amended Complaint was insufficient to put Defendant Neuhausel on notice that her alleged statements to police were the basis of Plaintiffs' defamation claim against her.

Although most of Count V of the Amended Complaint points to Diane's statements and attributes them to Defendants (see ¶¶ 61–62 and 64) [16], ¶ 63 states:

---

**16.** Plaintiffs have acknowledged that they are no longer seeking to hold Defendants liable for statements uttered by Diane. Pls.' Mem.Opp. at 14.

63. Defendants themselves made slanderous imputations by stating in group therapy that Daughter was the victim of incest and ritual satanic abuse and then inviting Daughter to state who had done these things at which point Daughter stated that Plaintiffs committed these acts.

Thus, Plaintiffs' Amended Complaint additionally sought to hold Defendants liable for statements allegedly uttered by Defendants to other Genesis clients that Plaintiffs subjected Diane to satanic ritualistic and sexual abuse.

With regard to Defendant Mansmann's alleged statement, Plaintiff Kenneth Tuman testified that he met Kathy Kelly and other former Genesis clients at a meeting of the False Memory Syndrome Foundation. K. Tuman dep. at 398–99. He further testified that Kathy Kelly told him that while at a Genesis retreat "the Pats or the Genesis people" told Ms. Kelly that Plaintiffs would "come after Diane." K. Tuman dep. at 399–400. Ms. Kelly gave more specifics at her deposition, when she testified that Defendant Mansmann told her that Diane had been raised to be a high priestess in a satanic cult, Diane's parents were leaders of the cult, Diane was no longer any use to the cult because she was getting healthy, and that they would probably kill Diane. K. Kelly dep. at 55–56. This alleged statement is clearly encompassed by ¶ 63 of the Amended Complaint.

I cannot find the same with regard to the alleged statements made by Defendant Neuhausel to the West Whiteland Township Police Department in July 1992. Although ¶ 63 encompasses the substance of what Defendant Neuhausel allegedly said to police,[17] it asserts simply that Defendants uttered defamatory statements to other Genesis clients, and makes no reference to defamatory remarks made to others outside the Genesis network. For this reason, I will grant Defendant Neuhausel's motion and enter judgment with respect to the defamation claim against her.

My inquiry does not end there, however, because Defendant Mansmann further argues that Plaintiffs' defamation claim against her must fail because there is an absence of evidence that Plaintiffs suffered special damages as a result of the defamation. *See* 42 Pa.C.S.A. § 8343(a) (West 1982) (setting forth plaintiff's burden of proof in defamation claims).[18]

◼ Plaintiffs argue in response that because Defendants statements constitute defamation *per se,* Plaintiffs do not need to prove special harm. Under Pennsylvania law, a plaintiff may recover on a defamation claim in the absence of proof that s/he suffered special harm as a result of the defamation, where the words constitute slander *per se. Walker v. Grand Central Sanitation, Inc.,* 430 Pa.Super. 236, 634 A.2d 237, 242 (1993), *app. denied,* 539 Pa. 652, 651 A.2d 539 (1994). Words imputing a criminal offense, loathsome disease, business misconduct or serious sexual misconduct constitute slander *per se. Chicarella v. Passant,* 343 Pa.Super. 330, 494 A.2d 1109, 1115 n. 5 (1985).

◼ Applying this criteria, I find that the alleged statements made by Defendant

---

**17.** According to a July 7, 1992 report, Defendant Neuhausel told police that Diane had been groomed by a cult in Mount Holly, N.J. since she was about two years old to become a high priest. In a report dated July 29, 1992, Neuhausel is reported to have said that she received a phone message from Diane that Diane was back at her parents' home in New Jersey, and that Neuhausel believed Diane was in serious danger and had been taken back to New Jersey against her will. Pls.' Mem.Opp., Ex. K.

**18.** The statute provides:
(a) Burden of plaintiff.—In an action for defamation, the plaintiff has the burden of proving, when the issue is properly raised:

(1) The defamatory character of the communication.
(2) Its publication by the defendant.
(3) Its application to the plaintiff.
(4) The understanding by the recipient of its defamatory meaning.
(5) The understanding by the recipient of it as intended to be applied to the plaintiff.
(6) *Special harm resulting to the plaintiff from its publication.*
(7) Abuse of a conditionally privileged occasion.
42 Pa.C.S.A. § 8343(a) (West 1982) (emphasis added).

Mansmann to Kathy Kelly, as described above, do not constitute slander *per se* because they do not impute loathsome disease, business misconduct, serious sexual misconduct, or criminal offense to Plaintiffs. As Defendant Mansmann points out, Plaintiffs have not demonstrated that being a member of a satanic cult is a criminal offense in Pennsylvania. *See Clemente v. Espinosa*, 749 F.Supp. 672, 679 (E.D.Pa.1990) ("A statement constitutes slander per se as an accusation of criminality when it charges either directly or indirectly the commission of a specific offense punishable by imprisonment") (citation omitted). The closest that Defendant Mansmann's statements come to imputing a criminal offense is by stating that Plaintiffs' cult would probably kill Diane. This, however, is equally insufficient because "[a] charge of criminal intent or design, or merely ability to commit a crime" does not constitute slander *per se*. *Id.* (citation omitted).

Therefore, I will enter judgment for Defendant Mansmann on the defamation claim against her as well.

## D. Intentional Infliction of Emotional Distress Claim

 Defendants correctly argue that in order to make out a claim for intentional infliction of emotional distress in Pennsylvania, Plaintiffs must offer expert medical confirmation that they actually suffered the claimed distress. *See Kazatsky v. King David Memorial Park, Inc.*, 515 Pa. 183, 527 A.2d 988, 995 (1987); *see also Krysmalski v. Tarasovich*, 424 Pa.Super. 121, 622 A.2d 298, 316–17 (Cirillo, J., dissenting) (explaining that "[i]n claims for intentional infliction of emotional distress, the supreme court imposed the requirement of expert medical evidence of the distress as a counterweight to

the ease with which fraudulent claims of outrageous behavior could be brought"), *app. denied*, 535 Pa. 675, 636 A.2d 634 (1993). Defendants contend that Plaintiffs will not be able to sustain this burden because they testified that they did not seek treatment for the various injuries they have alleged [19] nor were they diagnosed by a professional as suffering from these ailments. K. Tuman dep at 414–18; J. Tuman dep. at 212–13, 277–78, 284–85, 292, 306–07, 332.

The exception to this assertion is Kenneth Tuman's testimony that on one occasion he told his doctor during a physical that he felt depressed, and Joan Tuman's testimony that the same doctor diagnosed her husband as having high blood pressure in 1994. K. Tuman dep. at 414–15; J. Tuman dep. at 261–62. Plaintiffs, however, failed to submit any records from this physician with their opposition papers, and Plaintiffs' counsel acknowledged at oral argument that there was no expert medical confirmation in the record that Plaintiffs suffered these alleged physical injuries. Tr., 4/2/96, at 60.[20]

I therefore grant summary judgment on the intentional infliction of emotional distress claim against all three Defendants.

## E. Intentional Misrepresentation Claim Against Defendant Mansmann

 Defendant Mansmann argues that she is entitled to summary judgment on this claim because Plaintiffs testified that they never met Defendant Mansmann nor had any conversations with her until this lawsuit. K. Tuman dep. at 75, 292–93; J. Tuman dep. at 117. I agree. Because Plaintiffs' testimony establishes that Defendant Mansmann made no representations to them,[21] I will grant judgment in favor of

---

**19.** Plaintiffs testified that they have experienced a number of physical injuries stemming from their emotional distress, including depression, anxiety, sleeplessness, weight gain, hypertension, and sexual dysfunction. K. Tuman dep. at 414–18, 434–35, 442–43, 446–47; J. Tuman dep. at 261–62, 276–77, 284, 327, 332.

**20.** Plaintiffs assert that the Court should not enter judgment for Defendants on this claim, because Plaintiffs provided medical releases to Defendants but Defendants failed to subpoena these

records. This argument is irrelevant. Once Defendants established that there was no expert medical confirmation of Plaintiffs' alleged injuries in the record, it became Plaintiffs' burden to produce that expert medical evidence to defeat the motion for summary judgment on this claim.

**21.** To make out a claim for intentional misrepresentation, Plaintiffs must demonstrate: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true

Defendant Mansmann on the misrepresentation claim against her.

## F. Remaining Claims

 Defendants Neuhausel and Genesis Associates stated in their motion that they were moving for summary judgment on all of Plaintiffs' claims. I note, however, that Defendants Neuhausel and Genesis Associates did not present any arguments in their papers or at oral argument with respect to the intentional misrepresentation claim or the punitive damages claim. For this reason, I deny Defendants Neuhausel's and Genesis Associates' motion for summary judgment with respect to these two claims against them.

## IV. CONCLUDING SUMMARY

To summarize, I will deny Defendants Neuhausel's and Genesis Associates' motions with respect to the negligence, breach of contract, intentional misrepresentation, and punitive damages claims. I will enter judgment in favor of Defendants Neuhausel and Genesis Associates on the intentional infliction of emotional distress and defamation claims against them. I will grant Defendant Mansmann's motion with respect to all of Plaintiffs' claims against her and enter judgment in her favor.

An appropriate Order follows.

### ORDER

**AND NOW,** this 25th day of April, 1996, upon consideration of Defendants Patricia A. Neuhausel's and Genesis Associates' Motion for Summary Judgment (Doc. No. 31), Defendant Patricia A. Mansmann's Motion for Summary Judgment (Doc. No. 32), Plaintiffs' Memorandum in Opposition (not docketed), Defendants' Reply Briefs (Doc. Nos. 35, 37), Plaintiffs' Surreply and Post–Argument Briefs (Doc.Nos. 38, 39, 43), and various correspondence received in chambers, and after oral arguments held on April 1 and 2, 1996,

**IT IS HEREBY ORDERED THAT:**

1. Defendant Neuhausel's and Genesis Associates' Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART.** Defendant Neuhausel's and Genesis Associates' Motion is **GRANTED** with respect to the intentional infliction of emotional distress (Count Four) and defamation (Count Five) claims in Plaintiffs' Amended Complaint. Judgment is entered in favor of Defendants Neuhausel and Genesis Associates and against Plaintiffs with respect to Counts Four and Five. Defendant Neuhausel's and Genesis Associates Motion with respect to the remaining counts in Plaintiffs' Amended Complaint is **DENIED.**

2. Defendant Mansmann's Motion for Summary Judgment in **GRANTED.** Judgment is entered in favor of Defendant Mansmann and against Plaintiff with respect to all counts in Plaintiffs' Amended Complaint against Defendant Mansmann.

---

or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. *Gibbs v. Ernst,* 538 Pa. 193, 647 A.2d 882, 889 (1994) (citations omitted).