658 A.2d 380

**Merlyn J. JENKINS, Appellant,**

v.

**COUNTY OF SCHUYLKILL, Appellee.**

Superior Court of Pennsylvania.

Argued March 16, 1995.

Filed May 8, 1995.

---

Donald A. Bailey, Harrisburg, for appellant.

Joseph H. Jones, Jr., Pottsville, for appellee.

Before HUDOCK, SAYLOR and HESTER, JJ.

HUDOCK, Judge:

Merlyn J. Jenkins (Appellant) appeals from the order entered by the trial court sustaining the preliminary objections in the nature of a demurrer filed by the County of Schuylkill (Appellee). We affirm.

In February of 1992, the Schuylkill County Board of Commissioners advertised in local papers seeking a "Request for Proposal" for the leasing of a building to be used for Schuylkill County's 911 Emergency Management Center. The advertisement specified, in pertinent part, that "[t]he Schuylkill County Commissioners reserve the right to reject any or all offers or to waive any informalities or defects or to negotiate for better terms." *See* Request for Proposal, at Plaintiff's Exhibit 1. All persons wishing to submit a proposal were required to follow the mandates set forth in the "Proposal Submission Package" which could be obtained at the county's Chief Clerk's office. A letter written by Appellee, which accompanied the proposal submission package, also stated, in pertinent part, that "[a]ny negotiations between proposal submitters and the Department of Real Estate must be reduced to a written agreement and are subject to approval by the Board of Commissioners." *See* Proposal Submission Package, ¶ 2. Further, the letter stated that Appellee would not be

responsible for any costs that the proposal submitter might incur in preparing the proposal. *See* Proposal Submission Package, ¶ 3.

On or about February 26, 1992, Appellant submitted a proposal package to Appellee. On May 13, 1992, Tom Rhoads, P.E., the Real Estate Director of the county, corresponded with Appellant through the following letter:

> This letter is to acknowledge the action of the Board of County Commissioners selecting the Park Hotel proposal as the prime candidate for the EOC/911 Center. The County desires to consummate a lease within the next thirty (30) days; good faith negotiations to conclude the lease development are to begin Thursday, May 14, 1992 at 3:00 p.m. in the Court House. *This brief one hour meeting will outline the lease items and project specifics which we will finalize in the next thirty (30) days.* The attached memo describes the construction related requirements to be perfected.

> Please be advised that your proposal is not accepted until the Board of County Commissioners takes official action on a lease.

> You are to be congratulated on the progress of the Park Hotel proposal. I look forward to the project's continued success.

Letter, 5/13/92, at Plaintiff's Exhibit 3 (emphasis added). Thereafter, between May 14 and June 17, 1992, several negotiation meetings were held between Appellant and Appellee. Appellant claims that in this time period, he was required to change the floor plans at least four times. However, by letter dated June 19, 1992, the county Board of Commissioners notified Appellant that it wished to terminate all further negotiations. As its basis, the Commissioners cited Appellant's "non-compliance in providing your construction documents and evidence of financing as required...." Letter, 6/19/92, at Plaintiff's Exhibit 4.

On April 14, 1994, Appellant filed a complaint against Appellee alleging that Appellee breached an implied contract and that Appellee breached an agreement to negotiate in good

faith. Appellant asserted that Appellee "substantially and unreasonably" altered many of the specifications from those originally enumerated in the Proposal Submission Package. Specifically, Appellant averred that Appellee, in failing to negotiate in good faith: 1) often amended the square footage to be obtained in the lease, causing Appellant to use the first two floors of the building rather than just the first; 2) added the requirement of on-site parking; 3) added the requirement of an elevator; 4) required that all materials used be fireproof; 5) failed to provide Appellant with necessary telecommunications information; 6) required Appellant to offer a firm completion date before the lease was awarded; and 7) required Appellant to obtain a building permit before the lease was awarded. *See* Complaint, at pp. 4–7. Appellant claimed that Appellee's continuous changes of the plans made it impossible for Appellant to meet the time requirement imposed by Appellee. Among these changes which Appellant claims were not in the original proposal package were the following: 1) Appellee required Appellant to provide unused space in the center for which Appellant would not be compensated; 2) Appellee required Appellant to provide a cost breakdown; 3) Appellee required Appellant to obtain a letter of credit, a letter of commitment for construction, and a contractor's performance bond; 4) Appellee required a utility rate decrease; 5) Appellee sought to implement a buyout clause starting in the fifteenth year of the lease; 6) Appellee required complete engineering specifications and "bid-ready" working plans; and 7) Appellee implemented a design completion schedule. *See* Complaint, at pp. 7–10. Appellant alleged that from the time of his original bid submission, the parties were to enter into "good faith negotiations" for a fifty-year lease agreement in conformity with the one set forth in the Proposal Submission Package, and such was breached. Specifically, it is averred that:

> By virtue of [Appellee's] conduct as above set forth, [Appellee] breached an implied contract in fact between the parties, under the terms of which the parties, viz., [Appellant] and [Appellee], would, by virtue of [Appellant's] origi-

nal bid submission, enter into "good faith negotiations" for the parties to enter into a fifty-year lease agreement of a building substantially in conformity with the original specifications referred to in [the "Request for Proposal."]

Complaint, ¶ 20.

As damages, Appellant alleged that he should be compensated in the amount of $909,593.00 for Appellee's breach of contract. In the alternative, he claimed that he should receive $68,969.07 in damages for Appellee's breach of duty to negotiate in good faith. This sum may be broken down as follows:

a. For expenses involved during the period November 15, 1991, to February 26, 1992, to prepare response to request for proposals from [Appellee] _____ $8,729.81.

b. For expenses involved with various conversations, dealings, computations for additional item pricing, and site reviews with various representatives of [Appellee] during the period February 27, 1992, to May 12, 1992, inclusive _____ $7,764.96.

c. Expense to negotiate with representatives of [Appellee] and to prepare five major plan options of varying square footage and levels, preparation of details, working drawings, specifications, and related activities; and, including the hiring of special private professional consultants to act and react to [Appellee's] demands, requests, and requirements in the negotiating process from May 13, 1992, to June 22, 1992, inclusive _____ $52,474.30.

Complaint, ¶ 21.

■■ In response to the complaint, Appellee filed preliminary objections in the nature of a demurrer. By order dated August 19, 1994, the trial court granted Appellee's preliminary objections. This direct appeal followed.

Our standard of review is as follows:

On review of an order sustaining preliminary objections in the nature of a demurrer and dismissing a complaint, our review is plenary. We must determine if the trial court correctly determined that, taking as true all properly pleaded material facts and disregarding all pleaded conclusions of

law, under no circumstances will the law permit recovery on the complaint.

*Bleday v. OUM Group,* 435 Pa.Super. 395, 399, 645 A.2d 1358, 1360 (1994) (citing *Pysh v. Security Pacific Housing Service,* 416 Pa.Super. 64, 69, 610 A.2d 973, 975 (1992), *alloc. den.,* 533 Pa. 625, 620 A.2d 491 (1993)). Also, we add that we are not bound to accept as true any averments in a complaint which are in conflict with exhibits which are attached to the complaint. *Philmar Mid–Atlantic, Inc. v. York Street Associates II,* 389 Pa.Super. 297, 299–301, 566 A.2d 1253, 1254 (1989).

Appellant breaks his argument into two parts. First, he claims that Appellee unilaterally terminated negotiations and this caused a material breach of contract. Appellant claims that on May 13, 1992, when Appellee engaged Appellant as the "prime candidate" for purposes of negotiations, a contract was formed. Thus, Appellant claims that there was a "breach of contract in the form of an unjustified termination of the selection of the Appellant as the lessor." Appellant's Brief, at p. 12. Appellant claims that he spent $52,474.30 in trying to accommodate Appellee's needs in reliance upon the alleged contract.

Because we cannot find that a contract has been formed, we cannot find merit in this argument. It is black letter law that in order to form an enforceable contract, there must be an offer, acceptance, consideration or mutual meeting of the minds. *Schreiber v. Olan Mills,* 426 Pa.Super. 537, 541–42, 627 A.2d 806, 808 (1993). It is also well-settled that "[a]bsent a manifestation of an intent to be bound, however, negotiations concerning the terms of a possible future contract do not result in an enforceable agreement." *Philmar,* 566 A.2d at 1255.

In the present case, there clearly was no contract. Despite the fact that the May 13, 1992 letter identified Appellant as the prime candidate for the emergency center, this clearly does not evidence an intention to be bound. The letter makes it clear that no contract could be entered into between the parties until an agreement was confirmed and accepted by

the Schuylkill County Board of Commissioners. Because there was not approval by the commissioners, Appellant's claim must fail.

In his second argument, Appellant avers that the actions of the parties constituted an agreement to negotiate in good faith and because of the constant changes demanded by Appellee, Appellee failed to negotiate in good faith. In support of his argument that such cause of action is cognizable in this Commonwealth, Appellant cites *Channel Home Centers, Division of Grace Retail Corp. v. Grossman,* 795 F.2d 291 (3d Cir.1986). In *Grossman,* the court was presented with the following issue:

> [W]hether, under Pennsylvania law, a property owner's promise to a prospective tenant, pursuant to a detailed letter of intent, to negotiate in good faith with the prospective tenant and to withdraw the lease premises from the marketplace during the negotiation, can bind the owner for a reasonable period of time where the prospective tenant has expended significant sums of money in connection with the lease negotiations and preparation and where there was evidence that the letter of intent was of significant value to the property owner.

*Id.* at 292. In that case, Bruce and Jeffrey Grossman (the Grossmans), in trying to develop a local mall, contacted Channel Home Centers (Channel) to try to obtain a lease from Channel as one of the mall's anchor stores. In expressing its desire to enter into the lease, Channel executed a detailed letter of intent which included the commitment that during the period of negotiating the lease, the Grossmans were to take the store off the rental market. The letter of intent also contained detailed terms concerning the lease, including the area of the store, the terms of the rent, the option period, taxes, the landlord's pre-term responsibilities and maintenance terms. *Id.* at 293, n. 2. However, when no lease was signed within thirty days of the letter of intent, the Grossmans cancelled all further negotiations. Channel thus instituted this lawsuit. Channel argued that "[b]y unilaterally terminating negotiations with Channel and precipitously entering into

a lease agreement with [another company], ..., Grossman acted in bad faith and breached his promise to 'withdraw the Store from the rental market and only negotiate the above-described leasing transaction to completion.'" *Id.* at 298. The District Court rejected Channel's claim that the letter of intent bound the parties to a contract. On appeal to the third circuit, Channel argued that the letter of intent, in totality with the surrounding circumstances, constituted a promise to negotiate in good faith. In deciding this matter, the court recognized that "evidence of preliminary negotiations or an agreement to enter into a binding contract in the future does not alone constitute a contract." *Id.* However, the court stressed that Channel was not arguing that a lease existed, but rather that there was a mutually binding obligation to negotiate in good faith. The court, relying on Pennsylvania contract law, was guided by the following three-part test to determine whether an agreement is enforceable: 1) whether both parties manifested an intention to be bound by the agreement; 2) whether the terms of the agreement are sufficiently definite to be enforced; and 3) whether there was consideration. *Id.* at 298–99. Thus, the court had to determine whether an agreement to negotiate in good faith met these requirements.

After reviewing the record, the court found that the parties intended to be bound. The court explained:

After the letter of intent was executed, both Channel and the Grossmans initiated procedures directed toward satisfaction of lease contingencies. Channel directed its parent corporation to prepare a draft lease; Channel planning representatives visited the lease premises to obtain measurements for architectural alterations, renovations, and related construction. Channel developed extensive marketing plans; delivery schedules were prepared and material and equipment deemed necessary for the store were purchased. The Grossmans applied to the township zoning committee for permission to erect Channel signs at various locations on the mall property. Channel submitted a draft lease on January 11, 1985, and the parties, through corre-

spondence and telephone conversations and on-site visits, exhibited an intent to move toward a lease as late as January 23, 1985. .... Accordingly, the letter of intent and the circumstances surrounding its adoption both support a finding that the parties intended to be bound by an agreement to negotiate in good faith.

*Id.* at 299–300. Asserting that a cause of action for breach of good faith negotiations should be cognizable in Pennsylvania, Appellant claims that the three-part test enunciated in *Grossman* has been satisfied. Therefore, Appellant states that Appellee breached this agreement because it did not use its best efforts to reach an agreement to have Appellant provide lease space to the county.

The cause of action for breach of an obligation to negotiate in good faith was discussed in *A/S Apothekernes Laboratorium For Specialpraeparater v. I.M.C. Chemical Group, Inc.,* 873 F.2d 155 (7th Cir.1989). The court stated:

The obligation to negotiate in good faith has been generally described as preventing one party from, "renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement." [*Teachers Insurance and Annuity Ass'n v. Tribune Co.,* 670 F.Supp. 491, 498 (S.D.N.Y.1987).] For instance, a party might breach its obligation to bargain in good faith by unreasonably insisting on a condition outside the scope of the parties' preliminary agreement, especially where such insistence is a thinly disguised pretext for scotching the deal because of an unfavorable change in market conditions. *Id.* at 506. The full extent of a party's duty to negotiate in good faith can only be determined, however, from the terms of the letter of intent itself. For example, our recent decision in [*Feldman v. Allegheny International, Inc.*], 850 F.2d 1217 (7th Cir.1988), demonstrates how the terms of the letter of intent control the scope of the obligation to bargain in good faith. In that case, the letter provided only that the potential seller would not "hold discussions or negotiate with any person other than [the potential buyer] ... while the proposed acquisition [was] being pursued." 850 F.2d at

1219. With the exception of setting a minimum cash component for the proposed sale, the letter did not set forth any previously agreed upon terms much less provide a general framework within which the parties intended to conduct their negotiations. As it turned out, such a commitment was not much of a commitment at all. It simply bound the seller to negotiate exclusively with the buyer in good faith until they disagreed; this was the full extent of the parties' obligation. In the absence of any agreed upon terms or even a general framework within which to conduct the negotiations, the parties were free to insist on or reject any proposed terms to the contract that they wished. As we explained in [*Feldman*],

> In a business transaction both sides presumably try to get the best of the deal. That is the essence of bargaining and the free market. And in the context of this case, no legal rule bounds the run of business interest. So one cannot characterize self-interest as bad faith. No particular demand in negotiations could be termed dishonest, even if it seemed outrageous to the other party. The proper recourse is to walk away from the bargaining table, not to sue for "bad faith" in negotiations.

> *Id.* at 1223. Thus, the scope of any obligation to negotiate in good faith can only be determined from the framework the parties have established for themselves in their letter of intent.

*Apothekernes*, 873 F.2d at 158–59.

■ Without determining whether a cause of action for breach of a duty to negotiate in good faith exists in Pennsylvania, it is evident that the facts as pleaded in this matter do not give rise to such a cause of action. From the record, we can discern nothing that sets forth the terms of the bid proposal package. In fact, the letter dated May 13, 1992 from Mr. Rhoads to Appellant specifically states that, at an upcoming meeting, "[the parties] will outline the lease items and project specifics which we will finalize in the next thirty (30) days." *See* Plaintiff's Exhibit 3. This clearly is not a detailed letter of intent and thus, this cause of action will not apply. It appears

that at the time of the letter, no specific terms were even agreed upon. Moreover, the language of this letter does not reveal that the parties intended to be bound by any terms of the original specifications.

Order affirmed.