Estate of Craig M. HALL, Deceased.

Appeal of Estate of Craig
M. Hall, Deceased.

Superior Court of Pennsylvania.

Argued Feb. 9, 1999.

Filed May 20, 1999.

---

Christopher Rosser, Philadelphia, for appellant.

Jeffrey L. Abrams, Philadelphia, for Biddle and Company, participating party.

Before STEVENS, LALLY–GREEN, and OLSZEWSKI, JJ.

LALLY–GREEN, J.:

¶ 1 Appellant, Estate of Craig M. Hall, Deceased, appeals from the July 27, 1998 order entered in the Court of Common Pleas of Montgomery County. We affirm.

¶ 2 The trial court set forth the facts as follows:

[Craig M. Hall (Hall)], worked for [Biddle and Co. Insurance Brokers, Inc. (Biddle)]. Pursuant to a July 1, 1988 stock purchase agreement between [Biddle] and [Hall], he acquired 3,230 shares of Biddle stock. The agreement specified the terms by which Biddle could repurchase the stock. There is no dispute over the value of this block of stock; however, [Hall] subsequently acquired additional shares, and it is the price to be paid for these that is the basis of the instant controversy.

At the hearing before the [trial court] on December 17, 1996, Maryanne Daly, Biddle's vice president and secretary, authenticated [Biddle's] articles of incorporation, . . . section 17.2 of which provided:

The holder of any shares of the common stock of the corporation shall not sell, assign, pledge or otherwise dispose of the same, nor shall such shares be transferable upon the books of the corporation, unless and until the holder shall have first given thirty days' written notice to the corporation of the holder's intention so to dispose of his shares; and during said period of thirty days the corporation shall have the right to purchase such shares, . . . at a price equal to the book value thereof determined in accordance with the usual accounting practice of the corporation, of such shares as of the date of said written notice; and upon the refusal or failure of the corporation to purchase said shares, . . . the said shares . . . shall be offered for sale to the shareholders in proportion to their respective holdings and upon the refusal or failure of the said shareholders to purchase the said shares . . . . the same may be sold to persons not shareholders. . . .

[Biddle's Bylaws, Article XVII § 17.2.] Section 17.3 stated:

Upon the death of any shareholder, the personal representative of said shareholder shall sell to the corporation, and the corporation shall purchase, as many . . . of the shares previously owned by the deceased shareholder as the corporation is legally able so to purchase, at the book value thereof, as defined in section 17.2 hereinabove, at the date of death of said shareholder. Payment for the said shares by, and delivery thereof to, the corporation shall be accomplished within one year of the date of death of the shareholder, and may be accomplished by the giving of a promissory note, for which the shares shall be collateral, the maturity of, and the interest on, which note shall be determined by mutual agreement between the corporation and the personal representative. . . .

[*Id.* at § 17.3.]

Ms. Daly testified that the restriction set forth in Section 17.2 was placed on each stock certificate. She stated that, at the time of his death, [Hall] owned 9,690 shares of Biddle

stock, which represented 30% of the outstanding shares.... Of the 9,690 shares owned by [Hall], one block of 3,230 ... were purchased by him from Bertha M. Fortney, under a stock purchase agreement dated October 1, 1992.

Mark Miller, executive vice president and treasurer of Biddle, testified that he worked for Biddle from 1985 through 1988, and from November of 1992 to the present. He testified that [Hall] obtained his original 3,230 shares of stock at the time Biddle purchased the assets of the Carnett Agency, Inc., an insurance agency of which [Hall] was the sole stockholder. Mr. Miller participated in the negotiations to buy back the shares owned by Bertha Fortney after she left Biddle's employ. He testified that [Hall] had put up $50,000 in February of 1992 in exchange for a promise that he would be issued additional shares of Biddle stock. However, [Biddle] had a negative net worth during this period and was not in a position either to buy Ms. Fortney's shares or to sell shares to [Hall]. Therefore, a deal was structured whereby Biddle paid Ms. Fortney $25,-000 over an 18–month period for her 3,230 shares, which shares were then issued to [Hall].

Mr. Miller testified that he and [Hall] often discussed the restrictions on the transfer of Biddle stock, as set forth in its articles of incorporation. He said [Hall] often expressed concern over the lack of a shareholder's agreement setting forth the formula for determining the book value of the stock he had acquired subsequent to the original 3,230 shares (which were covered by an agreement.) ... He stated that [Hall] had made several different proposals on the valuation question. Biddle made no proposals of its own....

Mr. Miller testified that [Hall], as a member of Biddle's board, received copies of ... financial documents [which indicated that the company had a negative equity].

Under cross examination, ... Mr. Miller was questioned about a letter dated January 27, 1992, from Frederick Tucker, president of Biddle, to [Hall], confirming a previous conversation concerning the latter's purchase of 6,460 shares of stock for investment of $50,-000. The letter stated, in part:

3. Corporate Valuation at Retirement or death will be one time gross commissions, using the previous calendar year as the valuation year.

4. The pay-out will be over a period of no less than 10 years, but could be as long as 15 years.

5. A promissory note will be signed to confirm the receipt of the funds until a final agreement is developed. At that time the promissory note dated 1/27/92 will be returned.

[Letter from Tucker to Hall, 1/27/92.]

\* \* \*

Counsel for Biddle also introduced a letter from [Hall] to Frederick Tucker dated September 30, 1992, in which [Hall] proposed that a stockholder's agreement be put in place covering, *inter alia*, the valuation of the corporate stock.... [Mr. Miller] testified that he discussed [the formula proposed in the letter] with [Hall] and told him it was incorrect. Mr. Miller stated that [Hall] continued to make other suggestions for valuing the stock after the September 30, 1992 letter. The witness testified that he and [Hall] bandied the issue about on a frequent basis, in part because Mr. Miller was himself contemplating becoming a shareholder.

[Appellant] presented the testimony of Alice Hall, [Hall's] widow and the executrix of his estate. She identified a promissory note signed by Frederick A. Tucker, as President of Biddle & Company and dated January 27, 1992, in favor of Craig Hall in the amount of $50,000. The note specified repayment

"with interest on the ... unpaid principal at the rate of seven and sixty-five on [*sic*] hundredths percent (7.65%) per annum from the date thereof ..." She also identified a check dated January 28, 1992, written on an account titled in the names of Craig Hall and Alice Hall in the amount of $50,000 payable to Biddle & Company....

Trial Court Opinion, 4/4/97, at 1–6 (citations omitted).

¶ 3 The parties also presented testimony concerning the buy back of the initial 3,230 shares at the price of $200,000 pursuant to the Stock Purchase Agreement.

¶ 4 Following the hearing, the trial court entered a decree *nisi* ordering that: Appellant transfer the 6,460 shares of Biddle stock to Biddle; and Biddle make a lump sum payment pursuant to the July 1, 1988 stock purchase agreement for the months of March of 1995 through January of 1996 inclusive, plus interest of 9% per annum. Appellant filed exceptions, which the trial court dismissed on June 10, 1997. On the same day, the trial court made the decree *nisi* absolute.

¶ 5 An appeal was filed to this Court. On April 23, 1998, this Court quashed the appeal as interlocutory on the basis that the trial court's order did not dispose of two counts of Appellant's amended counterclaim. *Estate of Craig M. Hall*, 718 A.2d 865 (Pa.Super.1998). On July 27, 1998, the trial court entered an order superseding its previous orders. This order disposed of all claims. This appeal followed.

¶ 6 Appellant raises three issues:

1. Whether a letter from a corporation promising to repurchase stock it has just sold, on terms set forth in the letter is enforceable.

2. Whether a corporate bylaw that requires the estate of a deceased stockholder to sell its stock to the corporation for book value is enforceable.

3. Whether the filing of a counterclaim demanding payment of all past due installments under a note requires the repayment of any installments which may have been withheld at the payee's request.

Appellant's Brief at 4.

¶ 7 Appellant first contends that the January 27, 1992 letter from Biddle to Hall constitutes an enforceable agreement that Biddle would repurchase 6,460 shares of Biddle's stock owned by Hall for approximately $400,000. An agreement is a valid and binding contract if: the parties have manifested an intent to be bound by the agreement's terms; the terms are sufficiently definite; and there was consideration. *Johnston the Florist v. TEDCO Const.*, 441 Pa.Super. 281, 657 A.2d 511, 516 (1995). When the trier of fact has determined the intention of the parties to an agreement, an appellate court will defer to the findings if the evidence supports them. *Yellow Run Coal Co. v. Alma–Elly–Yv Mines*, 285 Pa.Super. 84, 426 A.2d 1152, 1155 (1981). If the evidence is in conflict as to whether the parties intended that a particular writing should constitute an enforceable contract, it is a question of fact whether a contract exists. *Id.*

¶ 8 The record reveals that the evidence concerning the parties' intent is in conflict. The following evidence supports the trial court's conclusion that the parties did not intend to be bound by the contents of the January 27, 1992 letter. Mark Miller, a Biddle employee, testified that Hall repeatedly discussed the need to reach a shareholders' agreement to cover the 6,460 of Hall's shares not covered by the July 1, 1988 Stock Purchase Agreement. Hall was concerned that section 17.3 of the bylaws would require his estate to turn the shares over for nothing. Miller testified that these discussions occurred almost weekly from 1992 to 1994, the time of Hall's death. Miller stated that the inability to reach an agreement was over the issue of "transfer-on-death"

value of the shares. Hall sent a letter to Miller in September of 1992 proposing another formula for the valuation of the stock; however, Miller rejected this formula as involving too much money. Moreover, the January 27th letter explicitly states that the parties will reach a final agreement in the future. Thus, ample evidence exists, as reflected by the actions of both parties, that the parties did not intend the January 27th letter to be a binding agreement.

¶ 9 Appellant points to evidence allegedly supporting a conclusion that the parties intended to be bound by the January 27th letter. He points to other proposed terms in the letter, the issuance of the $50,000 note and Hall's acquisition of additional shares of Biddle stock. This evidence, however, creates a conflict in the evidence. As stated above, this conflict was to be resolved by the fact finder.

■■■ ¶ 10 Appellant next essentially argues that Section 17.3 of the bylaws, which the trial court determined required Appellant to transfer the shares for zero value, is not enforceable under Pennsylvania or Delaware law. The record reflects that Biddle & Company is a corporation organized under the laws of Delaware but is located in Pennsylvania.

¶ 11 We first determine which state's law applies. Pennsylvania law addresses this issue as follows:

> The courts of this Commonwealth shall not dismiss or stay any action or proceeding brought by a shareholder or representative of a foreign domiciliary corporation, as such, against the corporation or any one or more of the shareholders or representatives thereof, as such, on the ground that the corporation is a foreign corporation for profit or that the cause of action relates to the internal affairs thereof, but every such action shall proceed with like effect as if the corporation were a domestic corporation.... [T]he court having jurisdiction of the action or proceeding shall apply the law of the jurisdiction under which

the foreign domiciliary corporation was incorporated.

15 Pa.C.S.A. § 4145(a). Accordingly, since the record reveals that Biddle was incorporated in Delaware, Delaware law applies.

■■ ¶ 12 Appellant argues that the bylaw is not enforceable because it is unreasonable. A restriction on the transfer of securities of a corporation is permitted, *inter alia*, where the corporation is given an opportunity, prior to a sale of the securities, to acquire the restricted securities, or where the corporation is obligated "to purchase the securities which are the subject of an agreement restricting the purchase and sale of the restricted securities[.]" 8 Del.C. § 202(c)(1), (2). Such a restriction need not be justified by a business purpose to be enforceable. *Kerrigan v. Merrill Lynch, Inc.*, 450 F.Supp. 639, 646 (S.D.N.Y.1978)(applying Delaware law). Thus, Delaware law authorizes these types of restrictions even though the restrictions are not justified by a business purpose.

¶ 13 Appellant argues that the bylaw is unenforceable because it is unreasonable in actual operation. He argues that because the actual value of the stock was much greater than the book value, the disparity causes the stock transfer restriction to be unreasonable.

■■ ¶ 14 Under Delaware law, a valid agreement among the shareholders concerning the price of a stock purchase will not be deemed invalid because of the disparity between actual value and book value. *Shields Development Co. v. Shields*, 7 Del.J.Corp.L. 354, 1981 WL 7636 (1981). In *Shields*, the shareholders had an agreement which provided that upon the death of a shareholder, the surviving shareholders had the right and option to purchase the stock at book value. *Id.* at 356-57. Upon the death of a shareholder, the corporation sought to compel the transfer at book value. *Id.* at 359. The deceased shareholder's widow argued that the restriction was unconscionable and unen-

forceable because the book value of the stock was approximately $40,000 whereas the market value was in excess of $500,000. *Id.* at 361. The court found that the estate was bound by this valid transfer restriction. *Id.* at 362. Thus, despite the possible disparity between book value and actual value in the instant case, the restriction in Appellant's case is not unreasonable in actual operation under Delaware law.

¶ 15 Appellant cites *B & H Warehouse, Inc. v. Atlas Van Lines, Inc.*, 490 F.2d 818 (5th Cir.1974), to support its position that the transfer restriction is unreasonable. There, the court held that restriction on the transfer of stock was not enforceable because it had been put into effect after the shareholder had purchased the stock. *Id.* at 825–26. In fact, the court stated that "if the restriction being contested had been included in the original articles of incorporation, or had been a part of the by-laws when B & H acquired its stock, there would be no question that the restriction would be valid." *Id.* at 825. Thus, *B & H Warehouse* does not support Appellant's position.

█ ¶ 16 Appellant also contends that the *Shields* decision is inapposite to the instant case because the restriction in *Shields* was the result of a shareholders agreement rather than a bylaw. Accordingly, Appellant argues that contract law principles are not applicable to his case. "Corporate charters and by-laws are contracts among shareholders of a corporation and the general rules of contract interpretation are held to apply." *Centaur Partners v. Nat. Intergroup, Inc.*, 582 A.2d 923, 928 (Del.Supr.Ct.1990). Thus, since shareholder agreements and bylaws are both guided by the general rules of contract interpretation, Appellant's contention is meritless.

¶ 17 Appellant next argues that section 17.3 of Biddle's bylaws is unreasonable because only Biddle would have the opportunity to purchase. Appellant argues that since the book value of the stock was zero, and the stock had to be offered first to the corporation at book value before being sold to another purchaser, Biddle was the only possible purchaser.

¶ 18 Appellant claims *Greene v. E.H. Rollins & Sons, Inc.*, 2 A.2d 249 (Del.Ch. 1938) supports his argument that the by-law is unenforceable for this reason. In *Greene*, a corporation's articles of incorporation provided that, on demand of the corporation, a common stockholder was required to sell his or her shares. *Id.* at 250. The court refused to uphold the restriction because it was not reasonably related to a business purpose and because it effectively limited potential purchasers of the corporation's stock to the corporation itself. *Id.* at 252–54. The court explained that no one would buy the stock because, regardless of the price paid by the purchaser, the corporation could simply wait until the value of the stock dropped and then demand the stock, causing a loss to the purchaser. *Id.* at 253–54. The unreasonableness in *Greene* was the corporation's ability at any time to demand return of the stock.

¶ 19 *Greene* is not authority for this case. Here, Biddle had the statutory authority to purchase restricted shares. 8 Del.C. § 202(c)(1). Further, Biddle did not have the right, on demand, to require the return of the stock at any time. Rather, Biddle was given the first opportunity to buy the stock at book value and, if it passed on the purchase and a purchaser bought the stock, the purchaser would not face the burden of having the stock recalled when the price was lower. Indeed, the record reveals that Biddle did not always repurchase stock even though the book value was zero. For example, Biddle did permit Fortney to sell her stock to Hall and did not exercise its option to obtain the stock at the book value of zero. Finally, as discussed previously, a provision strikingly similar to the instant provision was upheld in *Shields*. Accordingly, this claim is meritless.

█ ¶ 20 Appellant also argues that section 17.3 of the bylaws does not apply

because Hall did not have actual knowledge of the bylaw. Section 202(a) of the Delaware General Corporation Law provides that "a restriction ... is ineffective except against a person with actual knowledge of the restriction." 8 Del.C. § 202(a). The record reveals that Hall was a shareholder and director of the company. Also, Miller testified Hall attempted to assert the bylaws in order to force Fortney to return her shares to Biddle. Further, Miller testified that he also knew Hall was aware of the restrictions because of discussions the two of them had concerning the stock. N.T., 12/17/96, at 67–69. Therefore, the fact finder had sufficient evidence to conclude that Hall had actual knowledge of the restrictions.

¶ 21 Appellant further argues that the doctrine of equitable estoppel applies to prevent Biddle's purchase of the shares for zero value because Biddle agreed, pursuant to the January 27, 1992 letter, to purchase the shares for approximately $400,000. In *Zitelli v. Dermatology Educ. & Res.*, 534 Pa. 360, 633 A.2d 134 (1993), our Supreme Court set forth the requirements for equitable estoppel as follows:

> There are two essential elements to estoppel; inducement and reliance. 'The inducement may be words or conduct and the acts that are induced may be by commission or forbearance provided that a change in condition results causing disadvantage to the one induced.'

*Id.* at 370, 633 A.2d at 139 (quoting *Novelty Knitting Mills, Inc. v. Siskind*, 500 Pa. 432, 432, 457 A.2d 502, 502 (1983)).

¶ 22 In the instant case, we have already concluded that the fact finder had sufficient evidence to conclude that Hall did not believe that the January 27, 1992 letter was an agreement. Accordingly, Hall could not have relied on or been induced by that writing. Thus, equitable estoppel does not apply.

¶ 23 Appellant also argues that *Biddle* waived section 17.3 of the bylaws

by participating in the transactions provided for in the January 27, 1992 letter. If a party fails to support a claim with citations to relevant authority, the claim is waived. Pa.R.A.P. 2119(b); *McMichael v. McMichael*, 700 A.2d 1337, 1339 n. 6 (Pa.Super.1997). Appellant does not cite any authority in support of this contention. Accordingly, the argument is waived.

¶ 24 Finally, Appellant argues that the trial court erred in calculating that Biddle was delinquent on 11 payments for the repurchase of the first 3,230 shares of Biddle stock acquired by Hall in 1988. The record reveals that this repurchase was governed by the Stock Purchase agreement executed on July 1, 1988. This agreement stated that "upon the death of Hall, the company shall repurchase the stock for a purchase price of $200,000 . . . ." Stock Purchase Agreement, July 1, 1988, § 8(b). Hall died in August of 1994 and the first payment occurred in February of 1996. Miller testified that Hall's wife requested that Biddle delay the payment because of controversies that had arisen about the administration of the Estate. In contrast, Hall's wife testified that she never requested that the payments be withheld. The court, in exercising its role as fact finder, determined that the "truth lay somewhere in the middle[,]" and ordered that 11 payments were due for the months of March of 1995 through January of 1996. Trial Court Opinion, 4/4/97, at 12–13. The trial court also included interest at the rate of 9% per annum. Appellant has failed to demonstrate that the trial court, which served as fact finder in this situation, erred. This claim is meritless.

¶ 25 Accordingly, for the foregoing reasons, we affirm the order of the trial court.

¶ 26 Order affirmed.

¶ 27 STEVENS, J., joins,
OLSZEWSKI, J., concurs in the results.