**AIRCRAFT GUARANTY CORPORATION**

v.

**STRATO–LIFT, INC.,**

v.

**Bernard Van Milders and Bernard Van Milders, b.v.**

**No. CIV. A. 96–CV–5513.**

United States District Court, E.D. Pennsylvania.

June 15, 2000.

H. Thomas Hunt, Hunt & Scaramella, P.C., Cherry Hill, NJ, for plaintiff.

Richard G. Placey, Richard M. Donaldson, Montgomery, McCracken, Walker & Rhoads,.LLP, Philadelphia, PA, for defendants.

## DECISION

JOYNER, District Judge.

This breach of contract action was tried before the undersigned in December, 1998. The parties have submitted their proposed factual findings, legal conclusions and briefs and the matter is now ripe for disposition. Accordingly, the Court now make the following:

## FINDINGS OF FACT

1. Plaintiff, Aircraft Guaranty Corporation ("AGC"), is a Delaware corporation with its principal place of business in Heidelberg, Germany. The plaintiff also maintains a business address in the office of its Vice President, William Walker, in Houston, Texas. Plaintiff's President and Chairman of the Board is Connie Wood.

2. AGC's principal business is providing title servicing and management services to non-U.S. citizens who want to own U.S. registered aircraft.

3. Defendant is Strato–Lift, Inc. ("SLI"), a Pennsylvania corporation, with its principal place of business in Morgantown, Pennsylvania. Strato–Lift is in the business of manufacturing platform equipment. Although it has bought and sold various aircraft since 1985, it is not in the business of buying and selling aircraft but rather uses its planes for transporting its customers, going to trade shows and training programs and bringing people into its manufacturing plants.

4. Bernard Van Milders is a citizen and resident of Belgium and is the President of B. Van Milders, N.V., a corporation orga-

nized and existing under the laws of Belgium.

5. B.Van Milders, N.V. ("Van Milders") acts as an officer of several different companies, including Flying Partners, a Belgian partnership which sells partnership interests in corporate jets and planes to international businesses. The principal business of B. Van Milders, N.V. is buying and selling airplanes, largely through Flying Partners. There is no such entity as Bernard Van Milders, B.V., B. Van Milders, b.v., Bernard Van Milders, b.v. or B. Van Milders, B.V.

6. B. Van Milders, N.V. and Aircraft Guaranty Corporation have a relationship whereby AGC sets up trusts and lease/operation agreements to procure November (FAA) registrations for Flying Partners aircraft in the United States. By utilizing an American/FAA registration, Flying Partners is able to reduce its operational costs in that it need only comply with the registration requirements of one country, as opposed to many, European countries.

7. At all times material hereto, Connie Wood was acting in his capacity as an officer, director, employee and agent of Plaintiff, Aircraft Guaranty Corporation.

8. In the summer of 1995, Strato–Lift decided to expose the 1993 Cessna Citation II which it purchased in April, 1995 from First of America Bank Corporation to the market. This was in keeping with Strato–Lift's practice of buying late model, low mileage aircraft, keeping and using them for a few months and then re-selling them for the same or a slightly higher price than that originally paid. In this fashion, SLI was able to avoid a lot of the maintenance costs associated with flying a plane for a lot of hours.

9. SLI thus retained Kenneth F. Goodrich, d/b/a K.F. Goodrich Associates, Inc. ("Goodrich") [1], a sole proprietorship located in New Milford, Connecticut, to broker the sale of its plane. Goodrich thereafter advertised the plane in various trade publications distributed both nationally and internationally.

10. At all times material hereto, Kenneth F. Goodrich and/or K.F. Goodrich & Associates, Inc. was acting as the authorized agent for Defendant, Strato–Lift, Inc.

11. In late October or early November, 1995, Mr. Van Milders informed Mr. Wood that he was interested in obtaining a late model Cessna Citation aircraft to be used in the Flying Partners program. Specifically, Van Milders was looking for a plane which was built no earlier than 1991 with less than 1500 hours of air time and he authorized AGC to locate such a plane for him.

12. Although AGC was purportedly acting on behalf of its "trust client," B. Van Milders, N.V., it was AGC—not Van Milders which was to take title to the plane from Strato–Lift.

13. On or about December 18, 1995, Mr. Wood requested a specification sheet on SLI's Citation II aircraft, which had a serial number of "725" from Mr. Goodrich. That same date, Mr. Goodrich responded via facsimile transmission with the requested specification sheet and advised that the asking price for the plane was $3,550,000.

14. Wood and Goodrich began negotiating for the sale of the plane and following the exchange of various offers and counter-offers, on December 27, 1995, Mr. Wood offered to purchase the plane for the sum of $3.5 million subject to eleven (11) listed conditions. Mr. Goodrich signed the letter agreement and faxed it back to AGC that same day.

15. Among the conditions listed in the December 27, 1995 letter agreement were:

3. All FAA directed airworthiness directives & mandatory service bulletins to be complied with as of time of deliv-

---

1. Although Plaintiff originally named Goodrich as a defendant in this action, it voluntarily dismissed him midway through the trial of this matter.

ery at expense of seller unless otherwise agreed to by the purchaser. Aircraft to be in airworthy condition per all applicable Federal Aviation Regulations at time of and place of delivery. Any CESS-COM scheduled *"Phase Maintenance Items"* due within sixty days (to include a Phase V inspection) to be completed prior to delivery at expense of seller.

4. Completion of a prepurchase inspection and test flight prior to and after completion of all maintenance and modifications performed. Prepurchase inspection and test flights will be at purchaser's expense and discretion. Items to be inspected and the results of said inspection are to be to the sole discretion and satisfaction of the purchaser. Purchaser reserves the right to reject the aircraft for any reason. Airworthiness discrepancies discovered during the prepurchase inspection or test flights must be corrected prior to delivery by seller unless otherwise waived by purchaser.

5. Prepurchase inspection to be conducted at a disinterested third party maintenance facility mutually agreeable to both parties. Purchaser to bear expense of fuel and pilot expense to move aircraft to facility chosen for prepurchase inspection.

16. At Wood's request, Goodrich contacted the various Cessna Citation Service Centers in Toledo, Ohio, Greensboro, North Carolina and Orlando, Florida. Goodrich was advised that the Orlando, Florida facility was booked through the end of January, but the facility in Greensboro, North Carolina could take the plane on January 3rd and could complete the pre-purchase inspection by January 5th. Goodrich passed this information on to Mr. Wood, who was to contact the Greensboro center directly.

17. Prior to its involvement with SLI's Citation II, AGC had had another plane inspected and maintenance work performed at AMR Combs, in Birmingham, Alabama, the sister company to American Airlines responsible for performing its inspection and repair work. Insofar as AGC had intended to hire two mechanics from AMR Combs to observe the prepurchase inspection on the 725 Citation, it requested and SLI agreed that the prepurchase inspection on that plane could be performed at AMR Combs.

18. Shortly thereafter, the parties began discussing the conduct of the Phase V inspection which was due to be performed on the plane in May, 1996. In follow-up to a conversation with Wood on or about December 30, 1995, Goodrich faxed a letter to him which read, in relevant part:

Also in Friday's conversation, you mentioned about leaving the aircraft open after the pre-purchase, "Why close it up do to Phase V inspection"? ? ?

If your (sic) requiring a Phase V inspection to be done with sale pr the wording on the offer and you didn't request this other than all phase inspections do (sic) in the next 60 days be completed with the sale, I have agreed we will. The Phase V is due on May 7, 1996. It's not due and not part of the sale at the price of $3,500,000 USD.

So please call me as soon as possible so we can get this taken care.

19. In a second note dated and faxed on January 2, 1996, Goodrich again stated:

... In your offer to purchase you requested that any phase inspection due within 60 days be complied with at the time of purchase and I agree to that, I didn't agree to in addition a Phase V to be part of this sale ...

20. Via letter dated and faxed on January 4, 1996, Goodrich advised Wood that,

We will sell the aircraft to your client $3,500,000 USD as agreed to in the previous offer with the following changes:

1. A phase V inspection can be completed on the aircraft. The costs for the inspection for labor to be at the expense of the buyer. Any parts con-

sidered to be airworthy items to be paid by the seller.

This offer needs to be confirmed by the end of the business Today Jan. 4, 1996 with a deposit in place otherwise we will consider your offer void and return the aircraft to the open market Jan. 5, 1996.

21. That same date, Wood faxed Goodrich a letter which stated, in relevant part:

It is the understanding of the parties involved that the pre-purchase inspection will include at a minimum, those inspections Hans called for in the CESS-COM Phase I, II, II, IV and V inspection program. Labor costs to perform the pre-purchase will be borne by the purchaser. Costs to correct airworthiness discrepancies discovered during the pre-purchase inspection will be paid by seller. These costs include labor, parts, or other associated items required to correct the airworthiness items.

That letter concluded with a line for Goodrich's signature by which he was to signify his acceptance of its terms and conditions.

22. AGC wired the $50,000 deposit to an Escrow account at Boatman's First National Bank in Oklahoma City, Oklahoma at 11:45 a.m. on January 4, 1996.

23. It was Wood and AGC's intention and understanding that the prepurchase inspection: (1) included the Phase V inspection such that they could reject the aircraft depending upon the results of the Phase V inspection; (2) they could inspect anything that they wanted to inspect at this time and (3) they could take as much time as they desired to conduct the inspection.

24. It was SLI's intention and understanding that the prepurchase inspection was to consist of the Cessna prescribed prepurchase inspection or survey (which would only take a few days) and that subsequent to the completion of that inspection and assuming that AGC accepted the aircraft, it could immediately move forward and have the Phase V inspection performed. In that event, the labor to perform the Phase V inspection was to be paid for by AGC while the costs for repairing any airworthiness discrepancies found were to be paid for by SLI. While SLI understood that a Phase V inspection would likely take some 2–3 weeks to perform, it did not intend to have its aircraft tied up for this period of time unless it had first been accepted for purchase by AGC.

25. Goodrich never executed the January 4, 1996 letter from Wood.

26. On Monday, January 8, 1996, SLI had the plane flown to AMR Combs in Birmingham for the prepurchase inspection, which began that same day.

27. On or about January 11, 1996, Goodrich wrote to Wood in an effort to determine whether AGC had accepted the aircraft and requesting that AGC pay the interest on the $3.5 million purchase price pending completion of the Phase V inspection. AGC responded via letter on that same date that it could not yet determine whether it would accept the plane as the Phase V inspection had not been completed and that since the parties' contract did not call for the payment of interest prior to closing, no such payment would be forthcoming.

28. On January 12, 1996, Goodrich again wrote to Wood advising that AGC was now in violation of the agreement in not accepting or rejecting the aircraft and that if they could not reach an understanding before January 15th, SLI would require that the aircraft be returned to an airworthy, fly-able condition.

29. Also on or about this same date, Goodrich received a list of some 18 airworthy discrepancies on the aircraft. An estimate of repair costs in the approximate amount of $44,000 followed on January 15th. Because it also discovered that AMR Combs was charging AGC some 20% less to conduct the Phase V inspection than its invoice reflected it would have charged SLI and that it had designated AGC to be a "preferred customer," SLI determined that AMR Combs was not a

"disinterested third party maintenance facility" as per the agreement and it therefore commanded that AMR Combs cease all work on the airplane immediately.

30. Despite not having yet accepted the plane, AGC filed an application with the FAA on January 16, 1996 to become the registered owner of the Citation II 725 aircraft. This had the effect of clouding the title to the aircraft.

31. SLI decided to move the aircraft to a Cessna facility rather than negotiating with AMR Combs for the discrepancy repairs. Before it could do so, however, it had to have the plane re-assembled.

32. Since AMR Combs ceased work against its orders, AGC refused to pay any of the expenses related to the aborted Phase V inspection. These costs totaled $12,511.45—$6,623.45 for the inspection work done and another $5,888 to return the plane to its condition on arrival. SLI paid all of these costs under protest. AGC paid nothing.

33. On January 25, 1996, Strato–Lift had the aircraft flown to Aerodynamics of Reading, which had performed the maintenance on it to date. A Phase I, II, III and V inspection was performed at that facility under the supervision of representatives from the FAA and Pratt & Whitney at a total cost of $24,673.78. SLI advised AGC of what it was doing and that it was welcome to send any representative(s) that it chose to attend and observe the inspections and repairs.

34. On January 30, 1996 and while the inspections were ongoing, SLI again offered to sell the aircraft to AGC for $3,525,000, which price was to have included the costs of the inspections and repair work. Via memorandum from its Vice President, William Walker, AGC advised that it would not accept Aero Dynamics as the inspecting facility and would only pay $3.5 million for the aircraft.

35. On February 16, 1996, SLI again offered the aircraft for sale to AGC under the same terms as those offered on January 30. AGC never responded to this offer.

36. After completion of the inspections in late February, 1996, SLI re-offered the Citation II for sale on the open market and continued to use the plane for its own business.

37. On March 27, 1996, SLI entered into an agreement for the sale of the plane to Duncan Aviation for the sum of $3.5 million. At this time, it learned that AGC had applied for FAA registration. In order to complete the transaction to Duncan, SLI executed a written indemnification in which it agreed to indemnify the buyer and its successors and assigns in the event of any further problems arising from AGC's preliminary registration.

38. AGC received a full refund of its $50,000 escrowed deposit monies and is not out-of-pocket any funds as a result of the aborted sale of the 725 Citation II aircraft.

### DISCUSSION

Plaintiff seeks damages for Defendant's alleged breach of the contract for the sale of the Citation II in the amount of the difference between the contract price and the fair market value of the aircraft in airworthy condition, together with attorneys' fees. Defendant, in turn, has counter-claimed for the damages which it incurred in having to pay for the partial inspection and re-assembly of the plane by AMR Combs, having an alternate facility conduct the appropriate inspections, its loss of the use of the aircraft while it was being inspected and the carrying costs and expenses suffered in transporting the plane and its pilot to Alabama and in carrying the plane until it could be sold to another purchaser.

 The elements of a breach of contract claim are well-established under Pennsylvania law. In order to form a contract, there must be an offer, acceptance, consideration or mutual meeting of the minds. *Jenkins v. County of Schuylkill*, 441 Pa.Super. 642, 648, 658 A.2d 380,

383 (1995), citing *Schreiber v. Olan Mills,* 426 Pa.Super. 537, 541–42, 627 A.2d 806, 808 (1993). A "meeting of the minds" occurs when both parties mutually assent to the same thing, as evidenced by the offer and its acceptance. *Refuse Management Systems, Inc. v. Consolidated Recycling and Transfer Systems, Inc.,* 448 Pa.Super. 402, 415, 671 A.2d 1140, 1146 (1996). *See Also: Degenhardt v. The Dillon Company,* 543 Pa. 146, 669 A.2d 946, 950 (1996).

■ Stated otherwise, under ordinary contract law, contracts are enforceable when parties reach a mutual agreement, exchange consideration and have set forth the terms of their bargain with sufficient definiteness to be specifically enforced. *USA Machinery Corporation v. CSC, Ltd.,* 184 F.3d 257, 263 (3rd Cir.1999); *Estate of Hall,* 731 A.2d 617, 621 (Pa.Super.1999); *Biddle v. Johnsonbaugh,* 444 Pa.Super. 450, 458, 664 A.2d 159, 163 (1995); *Dahar v. Grzandziel,* 410 Pa.Super. 85, 90, 599 A.2d 217, 220 (1991). An agreement is definite if it indicates that the parties intended to make a contract and if there is an appropriate basis upon which a court can fashion a remedy. *Biddle v. Johnsonbaugh, supra.* If a court is unable, due to indefiniteness or incompleteness in contracting, to determine whether the contract has been performed, then it must find that no contract existed in the first place. *Ingrassia Construction Company, Inc. v. Walsh,* 337 Pa.Super. 58, 68, 486 A.2d 478, 484 (1984).

When there has been no meeting of the minds between the parties, relief under a theory of quasi-contract in quantum meruit, a form of rescission, may be available. *Feingold v. Pucello,* 439 Pa.Super. 509, 654 A.2d 1093 (1995). A cause of action in quasi-contract for quantum meruit is made out where one person has been unjustly enriched at the expense of another. *Martin v. Little, Brown and Co.,* 304 Pa.Super. 424, 430–431, 450 A.2d 984, 988 (1981). Unlike true contracts, quasi-contracts are not based on the apparent intention of the parties to undertake the performances in question, nor are they promises. They are obligations created by law for reasons of justice. *Schott v. Westinghouse Electric Corporation,* 436 Pa. 279, 290, 259 A.2d 443, 449 (1969). Quasi-contracts do not require that there exists an expression of assent, and indeed may be found in spite of the party's contrary intention. *Id.*

■ To recover under a theory of quasi-contract and/or quantum meruit, the moving party must demonstrate that the other party has been unjustly enriched by wrongfully securing or passively receiving a benefit that would be unconscionable to retain. *Herbst v. General Accident Insurance Co.,* 1999 WL 820194, 1999 U.S. Dist. LEXIS 15807 (E.D.Pa.1999), citing *Hershey Foods Corp. v. Ralph Chapek, Inc.,* 828 F.2d 989, 999 (3rd Cir.1987); *Nabisco, Inc. v. Ellison,* 1994 WL 622136 at *4 (E.D.Pa.1994). To sustain a claim for unjust enrichment one must show that he conferred a benefit upon another, that the recipient realized the benefit and that retention of the benefit under the circumstances would be unjust. *Herbst,* 1999 WL 820194 at *9, 1999 U.S. Dist. LEXIS 15807, at *25. citing *Styer v. Hugo,* 422 Pa.Super. 262, 619 A.2d 347, 350 (1993), *aff'd,* 535 Pa. 610, 637 A.2d 276 (1994).

■ In application of all of the foregoing to this case, it is clear that while the plaintiff and defendant did agree that AGC would buy and SLI would sell the Citation II aircraft with serial number 725 for the sum of $3.5 million, the sale was contingent upon a pre-purchase inspection at a disinterested third party maintenance facility and test flight by the buyer. The parties, however, never reached the requisite "meeting of the minds" with regard to the pre-purchase inspection. Indeed, the buyer believed that the prepurchase inspection was to include the Phase V inspection (which could take several weeks to complete) and that it could reject the aircraft depending upon the results of the Phase V inspection, it could inspect any-

thing that it wanted to inspect, and it could take as much time as it wished to conduct the inspection. In contrast, the seller understood that the prepurchase inspection was to consist of the Cessna prescribed prepurchase inspection or survey (which generally took only a few days), and that after that inspection had been completed, AGC would notify it if it had accepted the aircraft. If so, AGC could then immediately move forward and have the Phase V inspection performed. Given that the purchase was contingent upon this inspection, there was no mutual assent on this material contract term, and plaintiff admits that it has not incurred any out-of-pocket expenses as a result of this transaction, we can make no other finding but that these parties never entered into a valid and enforceable contract and that the plaintiff's claims for breach of contract and damages must necessarily fail. Judgment shall therefore be entered in favor of the defendant on the plaintiff's complaint.

■ We reach a slightly different result with regard to the defendant's counter-claim. Specifically, Defendant sought damages for reimbursement of the payments which it made to AMR Combs and to the alternate inspection facility (Aero Dynamics of Reading) to conduct the appropriate inspections, for its costs and expenses in flying the plane to AMR Combs, and for its loss of the use of the aircraft while the inspections were being conducted. While we find that the defendant failed to produce sufficient evidence to sustain its claims for the costs resulting from transporting the plane to AMR Combs or for loss of the use of the aircraft, and that defendant would have had to pay for the inspections which were subsequently conducted at Aero Dynamics anyway given that it was the plane's owner, we do find that Defendant is entitled to restitution for the monies paid to AMR Combs for the labor and other costs incurred in partially performing the Phase V inspection and for the costs in re-assembling the plane and returning it to its arrival condition. In-

deed, given that AMR Combs had performed work for the plaintiff previously on other aircraft and considered it to be a "preferred customer," it was not a "disinterested third party maintenance facility" as was dictated by the parties' letter of intent. Moreover, the Phase V inspection, which necessitated the dismantling of the plane, was undertaken based upon the plaintiff's interpretation of the December 27th letter—not the parties' mutual understanding. We therefore find that Defendant conferred a benefit upon Plaintiff in paying for the aborted inspection and reassembly which it would be unjust to permit it to retain. We conclude that restitution is appropriate and we shall therefore direct that plaintiff reimburse the sum of $12,511.45 to the defendant on its counter-claim.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter and the parties to this action pursuant to 28 U.S.C. § 1332.

2. There was no "meeting of the minds" with respect to the pre-purchase inspection of the Cessna Citation II (serial # 725) jet owned by Defendant, which was one of the material terms of the parties' agreement.

3. The parties' did not have a valid and enforceable contract for the sale/purchase of the Citation II jet at issue and Defendant did not breach any agreement in reclaiming the aircraft from AMR Combs. Defendant is entitled to judgment in its favor and against Plaintiff on all of the Plaintiff's claims.

4. Defendant is entitled to restitution in the amount of $12,511.45 from Plaintiff on its counter-claim.

5. Bernard Van Milders and B. Van Milders, N.V. were not parties to the transaction between the plaintiff and the defendant and judgment is properly entered in favor of these additional defendants on the defendant's counter-claim.

An order follows.

*ORDER*

AND NOW, this day of June, 2000, it is hereby ORDERED and DECREED that Judgment is entered in favor of the Defendant and against the Plaintiff in no amount on all of the claims raised in Plaintiff's complaint, as amended.

IT IS FURTHER ORDERED that Judgment is entered in favor of the Defendant and against the Plaintiff only in the amount of $12,511.45 on Defendant's counter-claim.

IT IS STILL FURTHER ORDERED that Judgment is entered in favor of the Additional Defendant and against the Defendant and Defendant's claims against the Additional Defendant are DISMISSED with PREJUDICE.